[Cite as *State v. Grace*, 2023-Ohio-3781.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. W. Scott Gwin, P.J. |
|  | : | Hon. Patricia A. Delaney, J |
| Plaintiff-Appellee | : | Hon. Andrew J. King, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2022 CA 00039 |
| ANGELIQUE M. GRACE | : |  |
|  | : |  |
| Defendant-Appellant | : | OPINION |

CHARACTER OF PROCEEDING:      Criminal appeal from the Fairfield County
Court of Common Pleas, Case No. 2020
CR 00360

JUDGMENT:      Affirmed

DATE OF JUDGMENT ENTRY:      October 17, 2023

APPEARANCES:

For Plaintiff-Appellee      For Defendant-Appellant

R. KYLE WITT      SCOTT P. WOOD
Fairfield County Prosecutor      CONRAD & WOOD
BY; CHRISTOPHET A. REAMER      120 E. Main Street, Suite 200
Assistant Prosecutor      Lancaster, OH 43130
239 West Main Street, Suite 101
Lancaster, OH 43130

*Gwin, P.J.*

{¶1} Defendant-appellant Angelique Marquise Grace ["Grace"] appeals the January 6, 2022 Judgment Entry of the Fairfield County Court of Common Pleas overruling her motion to suppress.

*Facts and Procedural History*

{¶2} On July 30, 2020, Grace was indicted by the Fairfield County Grand Jury and charged with one count of aggravated burglary in violation of R.C. 2911.11(A)(1)/(B), a first-degree felony.

{¶3} On October 14, 2021, with leave of the trial court, Grace filed a motion to suppress evidence obtained pursuant to two search warrants, one issued on April 7, 2020 to AT&T and one issued April 23, 2020 to Google. In lieu of a full evidentiary hearing, the parties agreed to submit written arguments. The state filed a Memorandum Contra Defendant's Motion to Suppress on November 24, 2021. Grace filed a Response to the State's Memorandum Contra on December 20, 2021. By Judgment Entry filed January 6, 2022, the trial judge overruled Grace's motion to suppress.

{¶4} A jury trial commenced on September 6, 2022.

{¶5} Grace's mother, A.S.G. testified that Grace had a business cell phone plan with five to seven individuals listed. 1T. at 69.[1] She first met the victim, D.C., when D.C. moved in with Grace in 2018. She suspected the pair were romantically involved. Id. at 77. D.C. was given a phone on Grace's business plan. Id. at 69. Sometime around April 5, 2020 a dispute arose concerning the cell phone that D.C. was given. According to

---

[1] For clarity, the jury trial transcript will be referred to as, "__T.__," signifying the volume and the page number.

Grace's mother, D.C. did not want to pay her share of the bill and did not want to give the phone back to Grace. 1T. at 72. Grace thereafter reported the phone as stolen. Id. at 73. She further filed an insurance claim for the phone. Id. at 81.

{¶6} D.C. testified that she has known Grace for seven years. 2T. at 102. She denied the pair were romantically involved. Id. at 126. Grace gave D.C. a phone with the understanding that D.C. would pay her share of the phone bill. Id. at 113. D.C. considered the phone to be a gift. Id. at 112. She agreed that the phone was in Grace's name. Id.

{¶7} D.C. moved into her own apartment on Sheridan Drive in February, 2020. Id. at 121. Sometime in March, 2020, D.C. became upset that she had not been invited to Grace's birthday party. 2T. at 123-125. Shortly thereafter, a dispute arose concerning the phone bill. Id. at 126-127. On March 26, 2020, Grace sent messages via social media asking D.C. to pay her phone bill, give the phone back and take the Wi-Fi out of Grace's name. Id. at 130-131; 139. State's Exhibit 4.

{¶8} During the early hours of Sunday, April 5, 2020, D.C. heard a loud smashing noise in her apartment. 2T. at 144. D.C. had the phone in dispute in her possession and called 911. 2T. at 144; State's Exhibit 6. D.C. observed multiple individuals including Grace enter the smashed sliding back door. 2T. at 150-151. D.C. retreated to the bedroom, but the group forced open the door. D.C. was sprayed with mace, struck multiple times, and lost possession of the cellular phone. In addition to facially recognizing Grace, D.C. recognized the voice of co-defendant, O.D. 2T. at 156. D.C. testified that Grace is not the person who sprayed her with mace. 2T. at 154.

{¶9} Law enforcement was immediately dispatched to the residence. D.C. told law enforcement she was "absolutely certain" that Grace was the individual attempting to

enter the apartment and provided Grace's current AT&T phone number. Law enforcement found a pepper spray container on the floor of the residence, as well as broken glass from the sliding door and a garden paver and rock. The items missing from the residence were the phone in dispute and D.C.'s daughter's phone. 1T. at 149; 157. D.C.'s wallet and I.D. were also reported missing. 3T. at 546.

{¶10} O.D. testified that she has known Grace for five years. 2T. at 328. O.D. testified that Grace wanted her phone back, so Grace, O.D. and a third woman went to D.C.'s apartment on April 5, 2020. Id. 335. A rock was thrown in to gain access. Grace grabbed the phone and pepper sprayed D.C. Id. at 342; 360; 364; 368-369; State's Exhibit 21. O.D. testified that she had lied to the police and reported that she and Grace were in the Grove City area at the time of the burglary. 2T. at 347. O.D. testified that she pled to a reduced charge in exchange for her testimony against Grace. Id. 351.

{¶11} Andrea Weisenburger from the Ohio Bureau of Criminal Investigation [BCI] testified that the pepper spray container recovered from D.C.'s apartment was submitted for DNA analysis which revealed a mixture of DNA profiles. 3T. at 450. One major profile was found to be consistent with D.C.'s DNA, with a statistic of rarer than 1 in 1 trillion. Id. at 452-453. Of the three minor contributors, there was some male DNA present. Id. at 450-451; 454.

{¶12} Seth Dodson of the Ohio State Highway Patrol Intelligence Unit testified as an expert concerning cell phone geolocation information. 3T. at 667; 681. Dodson explained that whenever an individual uses his or her cell phone to access social media or the internet the phone connects to the cellular providers network and their cell towers. Id. at 669. He testified that a cell phone is constantly communicating with the network as

long as the phone is turned on. Id. The phone needs to determine its location in order to determine the best possible signal. Id. at 669-670.

{¶13} Dodson explained that "active data" is when the phone is actually being used, for example, to make a call, send a text message or searching the internet. Id. at 670-671. "Non-active" usage is described as the pinging of cell phone towers by the phone. Id. at 675-676. The Network Event Location System, or NELOS, can estimate how far away from a given cell phone tower the particular phone is located. Id. at 676. In other words, the NELOS information gives the best estimate of the location of the cell phone. Id.

{¶14} For active cell phone use, the network provider logs which cell phone site was actually used by the phone. 3T. at 677. Both NELOS and Google location records can be filtered by accuracy to make the results more useful. Id. at 683. Dodson explained that the data received from the cellular provider is run through a computer program exclusively used for law enforcement. This will generate a map. 3T. at 672-673.

{¶15} Actual call detail records are not the most precise; rather they generate an estimate of a coverage area for a particular cell phone tower. Id. at 684. In the case at bar, the NELOS report that was generated showed Grace's cell phone moved from southwest Columbus, possibly the Grove City area to Lancaster between 11:00 p.m. and midnight on April 4, 2020. Id. at 696-697.

{¶16} Dodson testified that this type of data is not as accurate as GPS data. 3T. at 739-740. The information would also not be considered to be triangulation data. Id. at 741. In fact, the data utilized in this case is the least accurate method to determine location. Id. The accuracy of the data provided is an estimation that the phone was within

5,000 meters, or 5 kilometers or 3.1 miles in all directions from a given cell phone tower. Id. at 746-747; 750. Dodson further testified that, for a variety of factors, a cell phone may not connect to the tower that is nearest to it geographically. 3T. at 750.

{¶17} Detective Alex Sinewe covertly recorded his interview with Grace at her home on April 6, 2020. Grace told the detective about the phone dispute but stated she was in Grove City at the time of the offense to assist her friend, O.D. whose car had broken down. Detective Sinewe also monitored Grace's calls from the jail after her arrest pursuant to her indictment. On July 31, 2021, Grace placed a call to V.G., a former girlfriend. During the recorded call Grace instructed V.G. to call her probation officer from a separate misdemeanor conviction and tell him, "[T]his matter that I'm in here is not something that had to do with me. I more so kind of tagged along." 4T. at 882.

{¶18} Detective Sinewe testified that if an individual has, especially an Android cell phone, and if the individual has location services on the phone activated, you can get a much more accurate area where the cell phone is located. 4T. at 867. D.C.'s phone was an Apple I-Phone. 2T. at 110-111. Grace's phone was also an Apple I-Phone. 4T. at 872. Detective Sinewe admitted that you cannot always get location data from a person's Gmail account. 4T. at 867. Detective Sinewe was not qualified as an expert witness and did not detail the basis for his belief other than his past experience.

{¶19} Detective Sinewe obtained a search warrant for Grace's Gmail information for two phones and a computer. 4T. at 870; 872; State's Exhibit 17. Detective Sinewe specifically requested location data, services, subscriber information and search history. 4T. at 870. Detective Sinewe testified that no location data was received by him in

response to the search warrant. 4T. at 872-873. Detective Sinewe testified that he opened and read the contents of each individual folder that Google had sent, as well as the folders inside those folders. 4T. at 875-876. Detective Sinewe read Grace's Goggle search history and found a search inquiry on April 5, 2020 at 3:46 a.m. looking for how to rinse off mace. 4T. at 873. Further a search was done for Donato's Lancaster, Ohio at 9:23 p.m. Id. at 873-874. He admitted that cell phone location information could not be, and in fact, was not, provided by Google, which was the basis for Detective Sinewe's search warrant. Id. at 4T. at 872-873; 876. Detective Sinewe could not determine from which device the Google search was made, nor the individual who made the search request. 4T. at 905-906.

{¶20} The defense presented the testimony of Caleb Reynolds an expert with Interhack Corporation. 4T. at 956. Reynolds testified that the accuracy of the state's location data with respect to Grace's cell phone varied by as much as 5,000 meters. Id. at 969-970. He further testified to the factors that affect which tower a phone would select to connect, such as signal strength, geographic interference, and antenna direction. Id. 970-980.

{¶21} The jury returned a verdict of not guilty on the aggravated burglary charge but found Grace guilty of complicity to aggravated burglary, a first-degree felony. On October 13, 2022, Grace was sentenced to serve 4 to 6 years in a state penal institution.

*Assignment of Error*

{¶22} Grace raises one Assignment of Error,

"I. THE TRIAL COURT ERRED IN   OVERRULING APPELLANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF A SEARCH WARRANT."

*Law and Analysis*

**Standard of Appellate Review**

{¶23}  Appellate review of a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 154-155, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate witness credibility. See *State v. Dunlap*, 73 Ohio St.3d 308,314, 1995-Ohio-243, 652 N.E.2d 988; *State v. Fanning*, 1 Ohio St.3d 19, 20, 437 N.E.2d 583 (1982). Accordingly, a reviewing court must defer to the trial court's factual findings if competent, credible evidence exists to support those findings. See *Burnside,* supra; *Dunlap,* supra; *State v. Long*, 127 Ohio App.3d 328, 332, 713 N.E.2d 1(4th Dist. 1998); *State v. Medcalf*, 111 Ohio App.3d 142, 675 N.E.2d 1268 (4th Dist. 1996). However, once this Court has accepted those facts as true, it must independently determine as a matter of law whether the trial court met the applicable legal standard. *See Burnside,* supra, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539(4th Dist. 1997); *See, generally*, *United States v. Arvizu*, 534 U.S. 266, 122 S.Ct. 744, 151 L.Ed.2d 740(2002); *Ornelas v. United States*, 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911(1996). That is, the application of the law to the trial court's findings of fact is subject to a *de novo* standard of review *Ornelas*, supra. Moreover, due weight should be given "to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas*, supra at 698, 116 S.Ct. at 1663.

**{¶24}** Moreover, when a reviewing court determines that a warrant should not have been issued, it must then determine whether the good-faith exception applies, and that question is a question of law, subject to de novo review by the appellate court. *State v. Castagnola,* 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, ¶32, *citing* United *States v. Leary*, 846 F.2d 592, 606 (10th Cir. 1988).

**Issue for Appellate Review**: *Whether the judge had a substantial basis for concluding that probable cause existed that evidence of a more specific location for the cell phone would be found in the internet search history of Grace's Google account.*

**{¶25}** Grace argues that the search warrant violated the Fourth Amendment requirement of particularity, thereby rendering invalid the search of her Google account and Google search history. Further, Grace contends that the warrant affidavit failed to establish a minimal connection between the alleged crime of burglary and Grace's internet search history. [Appellant's brief at 10;12]. Specifically, the affidavit provided,

> Based upon training and experience of the Affiant, the Google application is a valuable tool in establishing specific whereabouts of the user by using wireless data associated with the subscribers account. It is believed that by reviewing the data associated with this Google email account, specific locations and more accurate range of areas of the phone associated with this Google account could be tracked.
>
> Wherefore your Affiant respectfully requests a search warrant to search and seize data and contents in the Google accounts associated with the user of Angelique Marquise Grace.

**{¶26}** The warrant authorized the seizure of the following information,

Google search history, Google maps history, historical location information related to Google accounts, IMEI numbers on records related to devices used; Geo-location information, GPS, connection logs and records of user activity (including connection dates, times and associated usernames); subscriber names, user names, screen names, other identifying information, mailing addresses, residential address(es), business address(es), email address(es), and telephone numbers, billing records, correspondence, device serial numbers, MAC address(es) and/or hardware/software identification information relating to devices associated with any account(s) associated with the email address [Grace's email address] for the time period of 0800 EDT April 3, 2020 to 2359 EDT April 6, 2020…

{¶27} We begin by noting what is not disputed by the parties. There was an eyewitness to the break-in who had known Grace for over seven years. 2T. at 102. Further, the state had already received geolocation cell phone tower information for Grace's cell phone in response to a subpoena served on her cellular provider AT&T, showing the phone in the proximity of the burglary at the time of the break-in. Therefore, the state had a suspect and also had probable cause to believe she had been involved in the crime. However, those facts standing alone do not give the police carte blanche to rummage through all of the suspects internet search engines, internet service provider records or location data records.

{¶28} Grace's arguments concern the "what" and the "why" of Detective Sinewe's affidavit. Specifically, "what" was to be searched, i.e. Grace's Google account and her

Google search history, and "why" was it to be searched, i.e. a belief that evidence of a more specific phone location would be found in Grace's Google account or Google search history.

**The Fourth Amendment and digital searches**

**{¶29}** The Supreme Court addressed some of the issue surrounding the search of digital devices and information in *Riley v. California*, 573 U.S. 373, 134 S.Ct. 2473, 189 L.Ed.2d 430 (2014), wherein it held that police cannot search a cell phone found on the arrestee's person at the time of his arrest without first obtaining a warrant.

**{¶30}** In *Riley*, the Court considered a petitioner's post-conviction challenge to the warrantless search of his "smart phone" that police officers found in his pocket at the time of his arrest following a traffic stop and that they later examined at the police station. Id. at 379-381. The police found, among other things, gang-affiliated material and a photo of the defendant with a car linked to a shooting. The evidence ultimately supported his conviction for three crimes, including attempted murder, that were unrelated to the initial arrest. Id. at 379-380. The government argued that, because the phone had been lawfully seized when the defendant was arrested, any information on the phone also was legitimately seized and could be used at trial. The government suggested that a search of all data on a cell phone was "materially indistinguishable" from searches of other physical items that might be found in a defendant's pocket. Id. at 393. The Court rejected that argument:

> That is like saying a ride on horseback is materially indistinguishable
> from a flight to the moon. * * * Modern cell phones, as a category, implicate
> privacy concerns far beyond those implicated by the search of a cigarette

pack, a wallet, or a purse. A conclusion that inspecting the contents of an arrestee's pockets works no substantial additional intrusion on privacy beyond the arrest itself may make sense as applied to physical items, but any extension of that reasoning to digital data has to rest on its own bottom.

*Riley,* 573 U.S. at 393.

{¶31} The Court identified several ways in which cell phones "differ in both a quantitative and a qualitative sense" from other objects that might be found on an arrestee's person. Id. The Court noted that the "immense storage capacity" of cell phones means that the physical limitation on the amount of information a person could carry no longer applied. Id. at 393-394. A large storage capacity means that even a single category of information, such as emails or photographs, can "convey far more than previously possible. The sum of an individual's private life can be reconstructed through a thousand photographs labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet." Id. at 394. Further, a cell phone collects "many distinct types of information—an address, a note, a prescription, a bank statement, a video—that reveal much more in combination than any isolated record." Id. at 395-396. Internet history can reveal "an individual's private interests or concerns;" location data can show where a person has been; and apps on a phone may provide information about, for example, an individual's political views, addiction treatment, dating, buying and selling, pregnancy, budgeting, and communicating. Id.

{¶32} The Court explained that the development of the cell phone had undermined assumptions supporting the incident to arrest exception to the warrant requirement; with a cell phone, an arrestee could be carrying the equivalent of all the information in his

house, or more. Therefore, the Court held that the exception could not be used to justify the search of cell phones, and it instead directed officers seeking to examine the contents of a cell phone to "get a warrant." Id. at 403.

**{¶33}** We realize that the search in this case was not of a physical cell phone. However, we believe the Supreme Court would find similar concerns as those expressed in *Riley* surround the police search of one's Google account and Google search history. The only discernable difference between the location of the digital evidence examined in *Riley* and that in the case at bar is the location of the data. In *Riley* the data was contained at least in part on a cell phone. In the case at bar, the location data was contained in the so-called "Cloud," i.e. computer servers or hard drives located elsewhere.

**{¶34}** Concerning cell phone tracking or location data, in *Carpenter v. United States,* the Court noted,

> Cell phones continuously scan their environment looking for the best signal, which generally comes from the closest cell site. Most modern devices, such as smartphones, tap into the wireless network several times a minute whenever their signal is on, even if the owner is not using one of the phone's features. Each time the phone connects to a cell site, it generates a time-stamped record known as cell-site location information (CSLI). The precision of this information depends on the size of the geographic area covered by the cell site. The greater the concentration of cell sites, the smaller the coverage area. As data usage from cell phones has increased, wireless carriers have installed more cell sites to handle the

traffic. That has led to increasingly compact coverage areas, especially in urban areas.

588 U.S.__, 138 S.Ct. 2206, 2211-2212, 201 L.Ed.2d 507(2018). The Court in *Carpenter* held, "[A]n individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." Id. at 2217, 201 L.Ed.2d 507(2018). As observed by the Court,

[T]he time-stamped data provides an intimate window into a person's life, revealing not only his particular movements, but through them his "familial, political, professional, religious, and sexual associations." [*United States v. Jones*, 565 U.S. 400], at 415, 132 S.Ct. 945 (opinion of SOTOMAYOR, J.). These location records "hold for many Americans the 'privacies of life.'" *Riley,* 573 U.S., at ——, 134 S.Ct., at 2494–2495 (*quoting Boyd*, 116 U.S., at 630, 6 S.Ct. 524). And like GPS monitoring, cell phone tracking is remarkably easy, cheap, and efficient compared to traditional investigative tools. With just the click of a button, the Government can access each carrier's deep repository of historical location information at practically no expense.

*Carpenter v. United States*, 585 U.S. __, 138 S.Ct. at 2217-2218.

**{¶35}** The immensity and complexity of digital data defy common notions that apply to the physical search of a home, physical records, or one's person, as aptly illustrated by the Court in *Riley* and *Carpenter.*

**{¶36}** We return to the facts of this case by noting in the case at bar a warrant was obtained.

**Requirement for obtaining a warrant before a conducting a search**

{¶37} We note in passing the increasing use of subpoenas to obtain user information from Google. In the time period between July 2012 to December 2012, Google reports that it provided user information to law enforcement in response to a subpoena 1,896 times.[2] In that same six-month period in 2022, subpoenas for user information from Google increased to 30,442. Id.

{¶38} The Fourth Amendment to the United States Constitution, applied to the states through the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or other things to be seized." Article I, Section 14 of the Ohio Constitution similarly provides that "[t]he right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched and the person and things to be seized." See also R.C. 2933.22(A); Crim.R. 41(C). In *Carpenter v. United States,* the Court observed,

> The Founding generation crafted the Fourth Amendment as a "response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an

---

[2]https://transparencyreport.google.com/user-data/overview?hl=en_US&user_requests_report_period=series:requests,accounts;authority:US;time:&lu=user_requests_report_period (Accessed Oct. 3, 2023).

unrestrained search for evidence of criminal activity." *Riley v. California*,

573 U.S. ——, ——, 134 S.Ct. 2473, 2494, 189 L.Ed.2d 430 (2014). In

fact, as John Adams recalled, the patriot James Otis's 1761 speech

condemning writs of assistance was "the first act of opposition to the

arbitrary claims of Great Britain" and helped spark the Revolution itself. Id.,

at —— – ——, 134 S.Ct., at 2494 (quoting 10 Works of John Adams 248

(C. Adams ed. 1856)).

588 U.S.__, 138 S.Ct. 2206, 2213, 201 L.Ed.2d 507(2018).

**{¶39}** To be valid, a search warrant application must show more than that a

person connected with a property is suspected of a crime. *Zurcher v. Stanford Daily*, 436

U.S. 547, 556, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). It must also establish that "there is

reasonable cause to believe that the specific 'things' to be searched for and seized are

located on the property to which entry is sought." Id.

**{¶40}** For a search warrant to issue, the evidence must be sufficient for the

magistrate to conclude that there is a fair probability that evidence of a crime will be found

in a particular place. The reviewing court then must ensure that the magistrate had a

substantial basis for concluding that probable cause existed. *State v. Castagnola,* 145

Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, ¶35, *citing State v. George*, 45 Ohio St.3d

325, 329, 544 N.E.2d 640 (1989), *citing Illinois v. Gates*, 462 U.S. 213, 238–239, 103

S.Ct. 2317, 76 L.Ed.2d 527 (1983), *quoting Jones v. United States*, 362 U.S. 257, 271,

80 S.Ct. 725, 4 L.Ed.2d 697 (1960). Probable cause is defined as "reasonable grounds

for belief, supported by less than prima facie proof but more than mere suspicion." *United*

*States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). It requires "only a probability or

substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

**Good faith**

{¶41} The "good faith exception" to the exclusionary rule is set forth in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and adopted by the Ohio Supreme Court in State *v. Wilmoth*, 22 Ohio St.3d 251, 490 N.E.2d 1236 (1986). Under the "good faith exception," the exclusionary rule should not be applied so as to bar the use in the prosecution's case-in-chief of evidence obtained by officers acting in objectively reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause. *State v. George*, 45 Ohio St.3d 325, 330, 544 N.E.2d 640 (1989), *citing Leon, supra* at 918-23, 926, 104 S.Ct. 3405. However, even under the "good faith exception," suppression of evidence is appropriate where any of the following occurs:

> * * the magistrate or judge * * ** * the magistrate or judge * * * was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth * * *; (2) * * * the issuing magistrate wholly abandoned his judicial role * * *; (3) an officer purports to rely upon * * * a warrant based upon an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) * * * depending on the circumstances of the particular case, a warrant may be so facially deficient-i.e. in failing to particularize the place to be searched or the things to be seized-that the executing officers cannot reasonably presume it to be valid.

*Leon, supra* at 923, 104 S.Ct. 3405.

{¶42} An affidavit is "bare bones" when it fails to establish a minimally sufficient nexus between the item or place to be searched and the underlying illegal activity. *State v. Schubert,* Slip Op. 2022-Ohio-4604, 2022 WL 17836574, ¶ 9, *citing United States v. McPhearson,* 469 F.3d 518, 526 (6th Cir. 2006). The Court in *Schubert noted,*

> To avoid being labeled as "bare bones," an affidavit must state more than "'suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge,'" *United States v. Christian*, 925 F.3d 305, 312 (6th Cir. 2019), *quoting United States v. Washington*, 380 F.3d 236, 241 (6th Cir. 2004), fn. 4, and make "'some connection,'" id. at 313, *quoting White* at 497, "'between the illegal activity and the place to be searched,'" id., *quoting United States v. Brown*, 828 F.3d 375, 385 (6th Cir. 2016).

*Schubert,* ¶10. There is no dispute that in the case at bar, the state had obtained the CSLI data from AT&T for Grace's phone prior to requesting the Google account and Google search history data. Clearly, and specifically, the Google subpoena suggested that *more precise location data* could be obtained by looking at Grace's Google account and her Google search history. Based upon the review of the affidavit in support of the warrant, it is just that - a suggestion, or better still, a hunch.

Detective Sinewe informed the court that "[b]ased upon [his] training and experience…the Google application is a valuable tool in establishing specific whereabouts of the user by using wireless data associated with the subscribers account." Of course, internet search applications such as Google and Gmail regularly contain

personal identifiers and call, text, and internet-browsing and location information. S*tate v. Schubert,* Slip Op. No. 2022-Ohio-4604, 2022 WL 17836574, ¶ 16. Therefore, the officer's averment adds nothing to the determination of probable cause in this case. Detective Sinewe did not provide a factual basis in his affidavit that would allow the judge issuing the search warrant to believe that Grace had used her Google account or a Google search to aid in either the planning or the execution of the break-in of D.C.'s apartment.

**{¶43}** Detective Sinewe continued, "It is *believed* that by reviewing the data associated with this Google email account, *specific locations and more accurate range of areas of the phone* associated with this Google account *could* be tracked." (Emphasis added). Although the affiant bases his assertion that he "believes" by reviewing the *data associated with* Grace's account, specific locations and more accurate range of areas of the phone associated with this Google account *could* be tracked based on his "training and experience," he does not venture to explain what that knowledge, training, or experience amounts to, let alone how it relates to the facts of this case. Detective Sinewe provided no background of his expertise in digital cell phone data, ISP data, or CSLI data to support his assertion. Without that information, the affidavit's language is wholly conclusory as to the existence of probable cause to search Grace's Google account and her Google search history. *See, State v. Schubert,* ¶ 16. "Furthermore, the affiant's repeated use of the term '[could]' patently signals that whatever his beliefs might have been regarding potential evidence [from the Google account], they were based in complete speculation. No basis for his opinion is provided other than 'training and experience.'" Id.

{¶44} In order to be something more than a generalized search, a factual basis must be set forth to believe 1). The training or experience that leads the affiant to conclude that a more specific location for the phone is obtainable from the place to be searched; and 2). A factual basis to conclude that more specific location than the cell tower geolocation information provided by AT&T can be obtained using the suspects Gmail or Google account.

{¶45} What makes the affidavit even more akin to a generalized search in this case is the fact the warrant requested information unrelated to the "more specific" location of the phone at the time of the break-in. For example, the affidavit authorized collecting evidence both *before and after* the date of the offense. Neither the affidavit nor the trial judge explained how location information a day before or a day after the offense occurred would place the phone or Grace at the scene of the crime. Moreover, the warrant authorizes the search of "*any account(s) associated with the email address.*" Emphasis added. When combined with the request for "subscriber names, user names, screen names, *other identifying information, mailing addresses, residential address(es), business address(es), email address(es), and telephone numbers, billing records, [and] correspondence…,*" the warrant more closely resembles the type of general warrant to search for evidence of a crime that our Founding Fathers condemned. These requests give the government explicit information not related to the location of the device at any given time.

{¶46} In *Schubert*, the Court observed,

It is axiomatic that a proper finding of probable cause requires the affidavit to show not only the affiant's knowledge but also that the affiant

has sufficient basis for the knowledge. *See Gates*, 462 U.S. at 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (a judicial officer's job is to determine "whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place"). It is thus inconceivable that an affiant's lack of knowledge could somehow contribute to a finding of probable cause.

Slip Op. No. 2022-Ohio-4604, 2022 WL 17836574, ¶19. In *State v. Castagnola*, the Court expressed its displeasure with generalized search requests for digital information,

We agree that the Fourth Amendment does not require a search warrant to specify restrictive search protocols, but we also recognize that the Fourth Amendment does prohibit a "sweeping comprehensive search of a computer's hard drive." [ *U.S. v.] Walser*, 275 F.3d [981] at 986 [ (10th Cir. 2001)]. The logical balance of these principles leads to the conclusion that officers must describe what they believe will be found on a computer with as much specificity as possible under the circumstances.

145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, ¶ 88.

In this case, the state was already in possession of the CSLI data. Detective Sinewe did not provide a factual basis in his affidavit that would allow the judge issuing the search warrant to believe that Grace had used her Google account or Google search history to aid in either the planning or the execution of the break-in of D.C.'s apartment. No specificity or factual basis was given by the affiant as to the nature of the more precise location information that could be obtained, or why more precise location information

could be found in someone's Google account or Google search history[3]. Considering the complete lack of factual information included in the affidavit, we hold that no reasonable officer would rely on the affidavit to establish probable cause to believe that Grace's Google account or search history would contain evidence of a more specific location of the phone at the time of the burglary. A well-trained police officer offering or encountering the language utilized in the affidavit in this case should know that such conclusory and speculative statements, without more, do not support a finding of probable cause. *See Aguilar v. Texas,* 378 U.S. 108, 111-115, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) (an affidavit that states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances pertaining to veracity, reliability, and basis of knowledge, is a bare-bones affidavit), *abrogated on other grounds by Gates*, 462 U.S. at 238-239, 103 S.Ct. 2317, 76 L.Ed.2d 527." *State v. Schubert,* Slip Op. No. 2022-Ohio-4604, 2022 WL 17836574, ¶17.

**{¶47}** On these facts, we hold that the information in the warrant affidavit did not establish a minimal connection between the alleged crime and the Google account and search history that were searched. We therefore find that the good-faith exception to the exclusionary rule does not apply. To hold otherwise would allow bare-bones affidavits like the one at issue here to be used time and time again in future investigations whenever one or more browser search histories, or Google accounts, are in the name of a suspect. *Schubert*, ¶21.

**{¶48}** Accordingly, we find the trial court's overruling of Grace's motion to suppress to be error. Grace argues that because the motion to suppress was overruled,

---

[3] At trial, the detective admitted that Google could not, and did not, provide a more accurate location of Grace's cell phone from her Google account or her Google search history data. 4T. at 872-873; 876.

the state utilized the Google search for how to rinse off mace during trial. Therefore, Grace

askes this court to order that she receive a new trial.

### Improperly admitted evidence

**{¶49}** Crim.R. 52(A) defines harmless error in the context of criminal cases and

provides: "Any error, defect, irregularity, or variance which does not affect substantial

rights shall be disregarded." Under the harmless-error standard of review, "the

government bears the burden of demonstrating that the error did not affect the substantial

rights of the defendant." *State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d

643, ¶ 15, *citing United States v. Olano*, 507 U.S. 725, 741, 113 S.Ct. 1770, 123 L.Ed.2d

508 (1993). An appellate court is required to reverse the conviction when the state is

unable to meet its burden. *Perry* at ¶ 15. *See, also, State v. West*, 168 Ohio St.3d 605,

2022-Ohio-1556, 200 N.E.3d 1048, ¶ 22.

**{¶50}** The following analysis was established to guide appellate courts in

determining whether an error has affected the substantial rights of a defendant, thereby

requiring a new trial. First, it must be determined whether the defendant was prejudiced

by the error, i.e., whether the error had an impact on the verdict. *State v. Morris*, 141 Ohio

St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 25 and 27. Second, it must be determined

whether the error was not harmless beyond a reasonable doubt. Id. at ¶ 28. Lastly, once

the prejudicial evidence is excised, the remaining evidence is weighed to determine

whether it establishes the defendant's guilt beyond a reasonable doubt. Id. at ¶ 29, 33.

*See also, State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 36–37.

**{¶51}** In the case at bar, Grace has not challenged in her appeal the sufficiency

or the manifest weight of the evidence. We find beyond a reasonable doubt, that the

evidence concerning a Google search for how to rinse off mace did not contribute to Grace's conviction. Further we find the testimony does not overcome the overwhelming evidence that supports the finding that Grace participated in the crime of burglary as found by the jury. We therefore find that testimony did not change the result of the trial and had no impact on the verdict. The testimony concerning the Google search was harmless beyond a reasonable doubt.

{¶52} Grace's sole assignment of error is sustained; however, finding any admission of the Google search evidence was harmless beyond a reasonable doubt, we affirm the judgment and sentence of the Fairfield County Court of Common Pleas.

By Gwin, P.J.,

Delaney, J., and

King, J., concur