[Cite as *State v. Mack*, 2025-Ohio-4812.]

IN THE COURT OF APPEALS OF OHIO
FIFTH APPELLATE DISTRICT
RICHLAND COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | |
| | : | |
| Plaintiff-Appellee, | : | Case No. 22CA83 |
| | : | |
| v. | : | |
| | : | DECISION AND |
| John H. Mack, Jr., | : | JUDGMENT ENTRY |
| | : | |
| Defendant-Appellant. | : | Date of Judgment: October 21, 2025 |

_____

APPEARANCES:

Elizabeth R. Miller, Ohio Public Defender, Max Hersch, Assistant Ohio Public Defender, Kimberly Burroughs, Assistant Ohio Public Defender, and Peter Galyardt, Assistant Ohio Public Defender, Columbus, Ohio, for appellant.

Jodie M. Schumacher, Richland County Prosecuting Attorney, and Philip D. Bogdanoff, Special Assistant Prosecutor, Mansfield Ohio, for appellee.

_____

Smith, J.

{¶1} Appellant, John H. Mack, Jr., appeals the judgment of the Richland County Court of Common Pleas convicting him of 17 misdemeanor and felony counts, which included charges of aggravated murder, murder, and kidnapping. On appeal, appellant contends that 1) the trial court erred when it held that the exigency exception to the warrant requirement permitted the first warrantless search of his home and backyard curtilage; 2) the trial court erred when it held that the consent exception to the warrant requirement permitted his niece to lawfully

consent to the second, third, and fourth warrantless searches of his home; 3) the trial court erred when it denied his motion to suppress unconstitutional searches via invalid search warrants; 4) the trial court erred and violated his right to a speedy trial when it denied his motion to dismiss; and 5) the trial court erred when it permitted a prosecution witness to read the table of contents from a book found in his truck upon his arrest. However, because we find no merit to the arguments raised on appeal, they are all overruled and the judgment of the trial court is affirmed.

## FACTS

{¶2} On May 12, 2021, a 17-count indictment was filed charging appellant with the following offenses:

| | |
|---|---|
| Count One: | Aggravated Murder, an unclassified felony in violation of R.C. 2903.01(A) and 2929.02(A), with a R.C. 2929.04(A)(7) Felony Murder Specification; |
| Count Two: | Aggravated Murder, an unclassified felony in violation of R.C. 2903.01(B) and 2929.02(A); |
| Count Three: | Murder, an unclassified felony in violation of R.C. 2903.02(A) and (D), and 2929.02(B); |
| Count Four: | Murder, an unclassified felony in violation of R.C. 2903.02(B) and (D), and 2929.02(B); |
| Count Five: | Kidnapping, a first-degree felony in violation of R.C. 2905.01(A)(2) and (C)(1); |
| Count Six: | Kidnapping, a first-degree felony in violation of R.C. 2905.01(B)(1) and (C)(1); |

Count Seven: Tampering With Evidence, a third-degree felony in violation of R.C. 2921.12(A)(1) and (B);

Count Eight: Tampering With Evidence, a third-degree felony in violation of R.C. 2921.12(A)(1) and (B);

Count Nine: Tampering With Evidence, a third-degree felony in violation of R.C. 2921.12(A)(1) and (B);

Count Ten: Tampering With Evidence, a third-degree felony in violation of R.C. 2921.12(A)(1) and (B);

Count Eleven: Tampering With Evidence, a third-degree felony in violation of R.C. 2921.12(A)(1) and (B);

Count Twelve: Tampering With Evidence, a third-degree felony in violation of R.C. 2921.12(A)(1) and (B);

Count Thirteen: Abduction, a third-degree felony in violation of R.C. 2905.02(A)(2) and (C);

Count Fourteen: Grand Theft of a Motor Vehicle, a fourth-degree felony in violation of 2913.02(A)(1) and (B)(5);

Count Fifteen: Gross Abuse of a Corpse, a fifth-degree felony in violation of R.C. 2927.01(B) and (C);

Count Sixteen: Domestic Violence, a first-degree misdemeanor in violation of R.C. 2919.25(A) and (D)(2); and

Count Seventeen: Obstructing Official Business, a second-degree misdemeanor in violation of R.C. 2921.31(A) and (B).

The charges stemmed from the death of Melinda K. Davis, appellant's ex-girlfriend, who was found deceased in the trunk of her car on March 14, 2021.

{¶3} A review of the record reveals that Davis, (hereinafter "victim"), had informed several family members and a friend that she intended to go to appellant's residence on the morning of February 25, 2021, in order to pick up a firearm that had been owned by a family member and was of sentimental value to her. Appellant and the victim had formerly resided in the house together, but the victim had moved out when the couple broke up. Appellant dropped her son off at school and then headed to appellant's residence shortly before 9:00 a.m. Prior to going there she texted her friend, Paula Littlefield, her plans and told her that if she hadn't called her within a few hours, something might be wrong. Littlefield was alarmed by the statement and requested appellant's address, which the victim provided. The evening prior, the victim had made plans with her niece, Jessica Lewis. The two were supposed to meet for breakfast around 11:00 a.m. on February 25th, but the victim did not show up. Lewis tried to call the victim but the calls went directly to voicemail. At that point, Lewis contacted the victim's other cousin, C.J. Higginbotham. The victim had informed Higginbotham the day prior of her plans to go to appellant's residence to retrieve the gun. Upon hearing from Lewis, Higginbotham drove to the Shelby Police Department and reported the victim as missing.

{¶4} Around the same time, at approximately 12:30 p.m., the Shelby Police Department received a call regarding a juvenile who had fled school on foot. That

juvenile turned out to be the victim's son, Darius Clark. The record indicates that the victim and her son had a disagreement the evening prior regarding sharing their location with each other on their phones. It was decided that each would share their location. Clark received a text from the victim shortly after she dropped him off at school the morning of the 25th asking him to call her. He began trying to call her, but her phone went to voicemail. At some point thereafter, the victim's location was turned off on her phone, causing Clark to be concerned and leading him to literally run from the school to look for his mother.

{¶5} It appears that based upon the information received from Higginbotham and Clark, the Shelby Police Department requested that the Richland County Sheriff's Office go to appellant's residence to check on the victim and speak to appellant. Detectives Justin Ady and Giovanni Masi arrived at appellant's residence at approximately 1:17 p.m. to find Paula Littlefield and Jessica Lewis already there. The detectives knocked on the front door, but no one answered.

{¶6} When law enforcement arrived at the residence, they also observed from the road two fires burning in appellant's backyard. Appellant's backyard was unfenced and visible from the road, driveway, and the neighbor's yard. Law enforcement was able to observe that the smoke was coming from a firepit and a grill with the lid closed. There was snow on the ground and the record indicates

that officers also observed several sets of footprints leading from the garage into the backyard.

{¶7} When they received no answer at the front door, officers entered the backyard and knocked on the back door. While knocking on doors and attempting to get someone to answer, Detective Ady believed he heard a sound coming from inside the house, but he could not be sure. At this point, both Littlefield and Lewis were visibly upset and crying and began to provide additional information regarding appellant and the victim's past relationship, which included violence on appellant's part. The women also related the information regarding the victim's text to Littlefield, as well as the victim's failure to show up for lunch with Lewis. The decision was made to call for additional units to assist.

{¶8} Additional units reported and in addition to Detectives Ady and Masi, Deputy Bert Skeen, Deputy Christian Reed, and Deputy Owen Ross arrived on scene. In updating the others when they arrived, Deputy Ady paraphrased the victim's text to Littlefield as stating that if Littlefield had not heard from her in two hours, she should call the police. Deputy Ross was familiar with the location as he had been dispatched there the day prior regarding a call from appellant's niece, Whitney Mack, who had reported a problem with the alarm system. While Deputy Skeen was assisting, he was also training Deputy Reed, who was new. Deputy Skeen entered the backyard and inspected the firepit to rule out the presence of

blood, weapons, or body parts, as he was concerned about destruction of evidence. All he found in the firepit was a burning cushion. He also opened the lid to the grill but found only papers burning. While he was in the backyard, appellant's neighbor informed him that appellant had been there earlier that morning and that burning trash was not appellant's normal practice.

{¶9} While Ross and Reed were in the backyard, appellant's ex-wife, Robyn Mack, arrived after having been contacted by law enforcement. She had a key to the house in order for her children, who she shared with appellant, to get into the house. It appears that information being gathered by the various deputies was being relayed either by phone or radio to Captain Zehner. Once Robyn Mack arrived, the decision to enter the residence was made and she let Deputy Ross and Captain Zehner in with her key. The officers cleared the residence and did not locate the victim. However, Robyn Mack picked up appellant's cell phone when it started ringing while it was sitting in appellant's bedroom in plain view. The caller was appellant's niece, Whitney Mack, who arrived at the residence shortly thereafter. Robyn Mack took appellant's phone with her outside and began going through the phone, commenting to law enforcement that appellant had a security system which was accessible through an app on his phone.

{¶10} While all of this was going on, several other things were occurring simultaneously. The Shelby Police Department and Richland County Sheriff's

Office were working together, sharing information, issuing a BOLO (be on the lookout) for the victim's vehicle, and they were also attempting to "ping" the victim's phone. When Whitney Mack arrived at the residence she informed the officers that she had been at the library because appellant had asked her to be out of the house between 8:00 a.m. and 5:00 p.m. that day because he had scheduled repairs to be done to the washer as well as the Wi-Fi in the house. Whitney had returned to the house when Robyn Mack informed her of the situation. At that point, Whitney let Deputy Ross back into the house for the second time. While in the house she informed him that a runner that was usually present in the entryway was missing, information which Ross relayed to Captain Zehner.

{¶11} From that point forward, the victim and her vehicle remained missing, and law enforcement was unable to locate appellant. The investigation continued, initially with the Shelby Police Department obtaining a search warrant to search the security system app on appellant's phone. Suspicious behavior was observed through the app, including video footage of appellant the morning of February 25, 2021, dragging things around inside his house, going back and forth behind a curtain, and then walking up to one of the wall mounted cameras and turning it around so that he would be out of view. Thereafter, the Richland County Sheriff's Office obtained a search warrant to search the contents of appellant's phone as well as his house.

{¶12} While in the house pursuant to the search warrant, officers observed several boxes that appeared to be from Amazon that may have been connected to appellant's work as a truck driver for J.B. Hunt. After speaking with J.B. Hunt, another warrant was obtained in relation to the boxes, which led to a separate receiving stolen property charge being filed. Law enforcement was thereafter called back to the residence several days later at the request of Whitney Mack, who reported that someone had been in the house. She detailed that parts of the floor had been ripped up, walls had been partially painted in the hallway, clothes with paint on them had been left, and items had been moved. Importantly, samples taken from some of the boxes during the execution of the search warrants ultimately revealed the presence of the victim's blood. At that point, the investigation changed from a missing persons investigation to a kidnapping investigation.

{¶13} Then, on March 4, 2021, appellant turned himself in. He was held in jail on the pending kidnapping and receiving stolen property charges. All the while, the search for the victim continued, with law enforcement discovering that appellant had rented a vehicle the day the victim initially went missing. Finally, on March 14, 2021, a J.B. Hunt employee found the victim's car parked in the parking lot of an apartment complex located near the business. The vehicle was filled with trash and it required great effort for law enforcement to be able to access the trunk

of the vehicle, where the victim's body was found.  Her body was found nude, covered in a blanket, with her hair shorn, her feet bound, and covered in what appeared to be pink glitter.  Later autopsy results showed that the victim died as a result of blunt force trauma, that she was strangled, and had suffered a broken neck.  Surveillance footage obtained from the surrounding area showed appellant walking from the apartment complex to the vehicle rental location on February 25, 2021.

{¶14} As a result, in addition to being charged with receiving stolen property in Richland County Court of Common Pleas case number 21CR0203, appellant was further indicted on the above 17 charges in case number 21CR221 on May 12, 2012.  These cases proceeded through the court as companion cases and were mostly handled together.  In case number, 21CR221, the underlying case at issue here, appellant began filing a series of motions on June 3, 2021, including various motions for the appropriation of funds for an expert witness and for discovery.  These motions were followed by another round of motions on June 21, 2021, seeking disclosure of grand jury transcripts, additional discovery, and a bill of particulars, among several others.  Another round of motions was filed by appellant on July 19, 2021, followed by a waiver of speedy trial filed by appellant on August 5, 2021.

{¶15} Thereafter, appellant filed a motion to suppress on January 3, 2022, followed by a supplemental motion to suppress on July 28, 2022. The motions applied to both pending cases and were heard together. Suppression hearings were held over the course of four days, with the trial court ultimately denying appellant's motions to suppress the results of the initial warrantless entry into his home, the purported consent searches of his home, as well as the subsequent searches of his cell phone, home, iPads, and security system conducted via warrant. The receiving stolen property case was dismissed on August 15, 2022. Subsequently, appellant orally revoked his speedy trial waiver on September 6, 2022, followed by a written revocation on September 23, 2022. Finally, Appellant filed a motion to dismiss based upon speedy trial grounds on October 21, 2022, which was denied by the trial court.

{¶16} The matter then proceeded to a jury trial beginning on October 24, 2022. The trial took place over 13 days and resulted in a trial transcript exceeding 3500 pages. The State presented 58 witnesses and introduced 388 exhibits. The State's witnesses included law enforcement officers from both the Richland County Sheriff's Office and the Shelby Police Department, friends and family of the victim, appellant's niece, and forensic specialists from BCI, among several others.

{¶17} Appellant testified on his own behalf and presented one additional witness, Julie Heinig, lab director of the DNA Diagnostic Center in Fairfield, Ohio. Appellant testified that he did not kill the victim. He claimed that just before he was leaving his house on the morning at issue, his former girlfriend and mother of another one of his children, Genevieve Adkins, arrived. He let her into the house and went to get his oil changed. He claimed that he returned to the house to find fires going in the backyard, vomit and urine in the house, and Adkins crying in the shower with blood and scratches on her. He testified that Adkins told him that the victim came into the house, hit her, and the two physically fought in the house. He also testified that he believed he saw the victim's car going around the corner as he approached the house. Adkins, however, did not testify at trial and the State disputed her existence.

{¶18} Appellant was ultimately found guilty on all 17 counts of the indictment and is serving a lifetime prison sentence. He has now filed a timely appeal, setting forth five assignments of error for our review.

ASSIGNMENTS OF ERROR

I.      THE TRIAL COURT ERRED WHEN IT HELD THAT THE EXIGENCY EXCEPTION TO THE WARRANT REQUIREMENT PERMITTED THE FIRST WARRANTLESS SEARCH OF JOHN MACK'S HOME AND BACKYARD CURTILAGE ON FEBRUARY 25, 2021, WHICH OCCURRED AT APPROXIMATELY 2:00 P.M.

II.     THE TRIAL COURT ERRED WHEN IT HELD THAT THE CONSENT EXCEPTION TO THE WARRANT REQUIREMENT PERMITTED WHITNEY MACK TO LAWFULLY CONSENT TO THE SECOND, THIRD, AND FOURTH WARRANTLESS SEARCHES OF JOHN MACK'S HOME, THE FORMER TWO OCCURRING ON FEBRUARY 25, 2021, AND THE LATTER OCCURRING ON MARCH 1, 2021.

III.    THE TRIAL COURT ERRED WHEN IT DENIED JOHN MACK'S MOTION TO SUPPRESS UNCONSTITUTIONAL SEARCHES CONDUCTED VIA INVALID SEARCH WARRANTS.

IV.    THE TRIAL COURT ERRED AND VIOLATED JOHN MACK'S RIGHT TO A SPEEDY TRIAL WHEN IT DENIED THE MOTION TO DISMISS.

V.     THE TRIAL COURT ERRED WHEN IT PERMITTED A PROSECUTION WITNESS, SPECIAL AGENT MORGAN SCARBERRY, TO READ THE TABLE OF CONTENTS FROM "THE 48 LAWS OF POWER" BOOK FOUND IN MR. MACK'S TRUCK.

ASSIGNMENT OF ERROR I

{¶19} In his first assignment of error, appellant contends that the trial court erred when it held that the exigency exception to the warrant requirement permitted the first warrantless search of his home and backyard curtilage, which occurred at 2:00 p.m. on February 25, 2021. Appellant argues the exigency exception to the warrant requirement did not apply and, therefore, the discovery of his cell phone and its contents inside the house, as well as statements made by Robyn Mack and officers' observations about the backyard all should have been

suppressed. The State responds by arguing that because law enforcement had developed reasonable, objective facts to believe that the victim was in danger of life or limb, the entry into the home was permitted under the emergency aid exception to the warrant requirement.

## Standard of Review

{¶20} "Appellate review of a trial court's decision to deny a motion to suppress involves a mixed question of law and fact." *State v. Methvin*, 2014-Ohio-590, ¶ 19 (5th Dist.), citing *State v. Long*, 127 Ohio App.3d 328, 332 (4th Dist. 1998). "During a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to resolve questions of fact and to evaluate witness credibility." *Methvin* at ¶ 19, citing *State v. Brooks*, 75 Ohio St.3d 148, 154 (1996). "A reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence." *Methvin* at ¶ 19, citing *State v. Medcalf*, 111 Ohio App.3d 142, 145 (4th Dist. 1996). "Accepting these facts as true, the appellate court must independently determine as a matter of law, without deference to the trial court's conclusion, whether the trial court's decision meets the applicable legal standard." *Methvin* at ¶ 19, citing *State v. Williams*, 86 Ohio App.3d 37, 42 (4th Dist. 1993), overruled on other grounds.

{¶21} As this Court explained in *State v. Street*, "there are three methods of challenging on appeal a trial court's ruling on a motion to suppress[,]" which are as follows:

> First, an appellant may challenge the trial court's findings of fact. In reviewing a challenge of this nature, an appellate court must determine whether said findings of fact are against the manifest weight of the evidence. *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982); *State v. Klein*, 73 Ohio App.3d 486, 597 N.E.2d 1141 (1991); *State v. Guysinger*, 86 Ohio App.3d 592, 621 N.E.2d 726 (1993). Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. *State v. Williams*, 86 Ohio App.3d 37, 619 N.E.2d 1141 (1993). Finally, assuming the trial court's findings of fact are not against the manifest weight of the evidence and it has properly identified the law to be applied, an appellant may argue the trial court has incorrectly decided the ultimate or final issue raised in the motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry*, 95 Ohio App.3d 93, 641 N.E.2d 1172 (1994); *State v. Claytor*, 85 Ohio App.3d 623, 620 N.E.2d 906 (1993); *Guysinger, supra*. As the United States Supreme Court held in *Ornelas v. U.S.*, 517 U.S. 690, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996), "... as a general matter determinations of reasonable suspicion and probable cause should be reviewed de novo on appeal."

*State v. Street*, 2020-Ohio-173, ¶ 14 (5th Dist.).

{¶22} As further explained in *Street*, "[w]hen ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and to evaluate the credibility of witnesses." *Street* at ¶

15, citing *State v. Dunlap*, 73 Ohio St.3d 308, 314 (1995) and *State v. Fanning*, 1 Ohio St.3d 19, 20 (1982). Of the three types of challenges set forth above, appellant appears to argue that the trial court incorrectly decided the ultimate issue raised in his motion to suppress, which involved the question of whether the warrantless search was justified by exigent circumstances. Thus, our review is de novo.

Summary of the Parties' Arguments Regarding the Applicability of the<br>Exigency Exception to the Warrant Requirement

{¶23} In support of his argument that the exigency exception to the warrant requirement did not apply, appellant contends that the facts available to the officers at the time of the warrantless entry did not support a reasonable belief that entry was needed to prevent or address serious imminent injury. Appellant argues that the reports from concerned family and friends were simply "generalized concerns without any contemporaneous factual basis that could be corroborated." Appellant further argues that the "contemporaneous behavior" of the officers at the scene confirmed there were not objectively reasonable grounds to enter the house, referencing a statement heard on Deputy Skeen's body cam made to trainee, Deputy Reed, that at that point, they didn't know if there was an emergency or if someone had just gone to Walmart without telling anyone. Appellant also claims that Deputy Skeen could be heard telling Deputy Reed "that only if [the victim's] phone 'pinged' inside the home would they be able to enter without a warrant."

Appellant argues that officers did not ultimately enter because they received a ping inside the home, but rather, they entered with Robyn Mack upon her "coincidental arrival" to the house.

{¶24} Appellant also argues that although officers observed a hot grill and smoldering campfire in the yard, there was no evidence of a "tumultuous scene," and that Deputy Ady "was unsure if he had heard any movement from inside the home." Regarding the backyard curtilage, appellant contends that "no more than a quick glance was needed to determine that [the victim] was not in the backyard and in need of assistance," and that law enforcement's search of the grill and firepit in the house's backyard curtilage was beyond the scope of any safety exigency that might have existed. Appellant argues that "a person in need of assistance could not have been discovered inside of the backyard grill, nor could they be found inside of a campfire." Thus, appellant argues that there was no "safety-related exigency justification for poking through the fire or opening the grill cover." Appellant further argues that because Deputy Ady completed a "quick glance" into the backyard at 1:19 p.m., there was no exigency justification for Deputy Skeen's "reentry into the backyard at 1:50 p.m."

{¶25} Finally, appellant contends that the exclusionary rule demanded suppression of his cell phone, its contents, Robyn Mack's statements about possible security software on the phone, as well as officers' observations about the

backyard.  He argues that neither the inevitable discovery doctrine nor the independent source doctrine apply as exceptions to the exclusionary rule in this case because the search warrants that were issued later were based upon the officers' prior unlawful entry and the observations made therein, which he claims affected the magistrate's decision to issue the warrants.

{¶26} The State contends that law enforcement had developed reasonable, objective facts to believe the victim was in danger of life or limb at the time they entered appellant's home.  In particular, the State references the concerns reported by the victim's friends and family, which stemmed from text messages received from the victim informing them that she was going to appellant's house that morning and if they didn't hear from her within a few hours something might be wrong.  The concerns also stemmed from the fact that the victim failed to show up for a pre-planned lunch with her niece, and no one, including her son, had been able to get in touch with her.  The State notes that the victim's best friend and niece were present at the house, were visibly upset and crying, and informed the officers that appellant had hit the victim and children in the past.  Additionally, at the time law enforcement had entered the home, a missing person's report had been filed with the Shelby Police Department by the victim's nephew.  Also, law enforcement had been made aware that the victim's son had fled school on foot out

of concern for her, stemming from the fact she had texted him asking him to call her but then did not answer and her location had been turned off on her phone.

{¶27} In addition to information provided by the victim's friends and family, law enforcement had arrived at appellant's residence and had been unable to get anyone to answer either the front or back door, despite one of the officers believing he had heard something from inside the house. Also, when law enforcement arrived, they observed from the street, appellant's driveway, and the neighbor's yard, two different fires burning. The fires were burning unattended in appellant's unfenced backyard. One fire was from a firepit and the other was a smoking, closed grill. Coupled with their observations were statements from the neighbor that appellant had been burning trash earlier in the morning, which the neighbor said was unusual for appellant. Further, despite there being no answer at either door, officers observed appellant's vehicle in the driveway and footprints around the driveway and into the back yard, giving them the impression that someone had been moving around the house.

{¶28} The State argues that during the 40-minute period between 1:18 p.m. when officers arrived and 1:59 p.m. when officers entered, they were knocking on the doors, gathering information from friends and family which indicated the victim's life was in danger, and speaking to neighbors. Regarding the alleged curtilage violation, the State argues that police could look into the yard and that it

was highly unusual for someone to be burning things on such a cold day. Importantly, the State points out that appellant has not indicated any evidence that was seized from the curtilage of the home prior to the entry, and officers were able to observe the fires as soon as they approached the home. The State further points out that when the officers entered the house with Robyn Mack, they did not seize any evidence. The State argues that Robyn picked up appellant's phone herself and reviewed the contents of the phone out of her concern for both appellant and the victim.

Fourth Amendment Principles

{¶29} The Fourth Amendment to the United States Constitution prohibits warrantless searches and seizures, rendering them per se unreasonable unless an exception applies. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507 (1967). "The exigent-circumstances exception has been recognized in situations of hot pursuit of a fleeing felon, imminent destruction of evidence, the need to prevent a suspect's escape, and risk of danger to the police and others." *State v. Methvin*, *supra*, at ¶ 22, citing *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir.1996).

{¶30} Another subset of the exigent-circumstances category is the emergency-aid exception. Courts recognize a community-caretaking/emergency-aid exception to the Fourth Amendment warrant requirement is necessary to allow police to respond to emergency situations where life or limb is in jeopardy. *See*

*State v. Dunn*, 2012-Ohio-1008, ¶ 21. In dealing with this exception, "[t]he key issue is whether the officers 'had reasonable grounds to believe that some kind of emergency existed * * *.' " *Methvin, supra,* at ¶ 23, quoting *State v. White*, 2008-Ohio-657, ¶ 17 (9th Dist.). For example, " '[t]he officer must be able to point to specific and articulable facts, which, taken with rational inferences from those facts, reasonably warrant intrusion into protected areas.' " *Id.* However, this Court has also observed that " '[a]n action is "reasonable" under the Fourth Amendment, regardless of the individual officer's state of mind, "as long as the circumstances, viewed *objectively*, justify [the] action." ' " (Emphasis in original.) *State v. Street, supra,* at ¶ 23, quoting *Brigham City, Utah v. Charles W. Stuart, et al.*, 547 U.S. 398, 404 (2006), in turn quoting *Scott v. United States*, 436 U.S. 128, 138 (1978). Importantly, this Court has explained that "[t]he emergency justifies the warrantless entry, and, while lawfully present, the police may seize evidence in plain view." *Methvin, supra,* at ¶ 23, citing *Thompson v. Louisiana*, 469 U.S. 17 (1984); *see also, State v. Buzzard*, 2007-Ohio-373, ¶ 16.

{¶31} The Supreme Court of Ohio stated as follows with respect to the duties of law enforcement in relation to the exigent circumstances exception to the warrant requirement:

> A warrantless police entry into a private residence is not unlawful if made upon exigent circumstances, a "specifically established and well-delineated exceptio[n]" to the search warrant requirement. *Katz v. United States* (1967), 389 U.S. 347,

357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576, 585. " 'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.' " *Mincey v. Arizona* (1978), 437 U.S. 385, 392-393, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290, 300, quoting *Wayne v. United States* (C.A.D.C.1963), 318 F.2d 205, 212, certiorari denied (1963), 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86. In *Wayne*, then-federal Court of Appeals Judge Warren Burger explained the reasoning behind the exigent circumstances exception:

"[T]he business of policemen and firemen is to act, not to speculate or meditate on whether the report is correct. People could well die in emergencies if police tried to act with the calm deliberation of the judicial process." *Wayne* at 212.

A warrantless search must be "strictly circumscribed by the exigencies which justify its initiation." *Terry v. Ohio* (1968), 392 U.S. 1, 26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889, 908. * * *

*State v. Applegate*, 68 Ohio St.3d 348, 349-350 (1994).

Thus, "the emergency aid exception does not require probable cause"; however, "officers must have reasonable grounds to believe there is an immediate need to act in order to protect lives or property, and there must be some reasonable basis for associating an emergency with the location." *Street* at ¶ 21, citing *State v. Bubenchick*, 2014-Ohio-5056, ¶ 14 (5th Dist.), in turn citing *State v. Gooden*, 2008-Ohio-178, ¶ 10 (9th Dist.). *See also State v. Stengel*, 2018-Ohio-2286, ¶ 35 (5th Dist.), citing *Michigan v. Fisher*, 558 U.S. 45, 49 (2009) ("Officers do not need ironclad proof of a 'likely serious, life-threatening' injury to invoke the emergency aid exception.").

Legal Analysis

{¶32} Here, based upon the totality of the circumstances, we conclude that officers had reasonable grounds to believe there was an immediate need to act, and that they further had reasonable grounds for associating an emergency with appellant's residence. First, multiple individuals who knew the victim well informed law enforcement that the victim planned to meet appellant at his residence that morning. Second, family members and friends had been unable to reach the victim since the time she was supposed to have been at appellant's residence, and they had converged upon appellant's residence when law enforcement arrived. Third, the victim failed to show up for a pre-planned lunch with her niece at the appointed time, after having told her best friend that she was going to appellant's house and that something might be wrong if no one had heard from her in a few hours. Fourth, a missing person's report had been filed by the Shelby County Police Department.[1] Thus, we conclude officers had reasonable grounds to believe there was an immediate need to act. They also had credible information that the victim had been at appellant's residence that morning, that

---

[1] Appellant argues in his reply brief that "stated concerns of friends and family justify warrantless entry into a residence only when coupled with other facts indicating an emergency." Appellant cites *Commonwealth v. Entwistle*, 463 Mass. 205 (2012) in support of his argument. In *Entwistle*, a warrantless search was upheld where a woman and her baby were missing for two days and the woman had missed lunch and dinner dates with three separate people. We find *Entwistle* actually supports upholding the warrantless entry here where the victim had been missing for hours, was unreachable, and had missed a scheduled lunch. We find it was unnecessary for law enforcement to wait for days instead of hours, or to wait for additional appointments to be missed, when those who knew her were concerned enough to make a missing persons report and begin looking for her themselves.

appellant had in fact been there and had left fires burning, and that the victim was unaccounted for, unreachable, and appellant's residence was her last known location.

{¶33} We agree with the trial court's determination that Robyn Mack, as appellant's ex-wife who possessed a house key for their children's use, did not have the authority to provide consent for the officers to enter the home. However, because we have concluded that the officers legally entered the home pursuant to the emergency aid subset of the exigent-circumstances exception to the warrant requirement, in our view, Robyn Mack's arrival simply allowed officers to enter without having to break down a door.

{¶34} We further find, contrary to appellant's argument, that there is evidence in the record indicating Detective Ady believed he heard a sound from inside the house. Based upon these facts, when officers received no response after knocking at the front door, they lawfully entered the backyard curtilage to knock on the back door. *See State v. Street, supra*, at ¶ 24 (categorizing the defendant's attached garage as part of the home's curtilage and finding that officers lawfully entered the garage to conduct a welfare check). *See also State v. Davis*, 2017-Ohio-7572, ¶ 18 (5th Dist.) (in the context of a "knock and talk," the court observed that "[w]here knocking at the front door is unsuccessful in spite of indications that someone is in or around the house, an officer may take reasonable

steps to speak with the person being sought out even where such steps require intrusion into the curtilage")[2]

{¶35} Additionally, and contrary to appellant's arguments, the exigent-circumstances exception to the warrant requirement also applies when circumstances indicate there could be imminent destruction of evidence. *See Methvin, supra*, at ¶ 22. The officers who poked through the fire and opened the grill lid indicated that in addition to being concerned for the victim's safety, destruction of evidence was another concern. Further, as argued by the State, at the time the initial entry was made pursuant to the exigent-circumstances exception, officers had seen nothing in the burning fires other than a cushion and some papers. Those items did not, at any point, become relevant to the subsequent investigation. Rather, it was the fact that there was both an open firepit and a closed grill left burning and unattended that officers found to be suspicious, and those facts were easily observable from outside the curtilage.[3]

{¶36} Finally, because we have concluded officers lawfully entered the home, plain view observations made once they were inside the home were admissible. *See State v. Methvin, supra*, at ¶ 23 ("The emergency justifies the

---

[2] Although not expressly argued by the parties, our de novo review of the record reveals testimony that officers were initially dispatched to appellant's residence to both speak to appellant and check on the victim.

[3] In our view, the existence of two open fires lent itself to two possible inferences. First, it lent itself to an inference that someone left, possibly abruptly, without ensuring the firepit wasn't still burning and that the grill was turned off. Second, it lent itself to an inference that someone must still be in the house if the grill was lit and burning. Either inference raised concerns when no one answered the door.

warrantless entry, and, while lawfully present, the police may seize evidence in plain view"), citing *Thompson v. Louisiana*, 469 U.S. 17 (1984). This included their observations that appellant's phone was left in his room. The evidence indicates that although Robyn Mack was initially contacted by law enforcement, she entered the house for her own reasons, and she is the one who picked up appellant's phone and began to look through it. Voluntary statements later made by her indicating that there was an app on the phone related to the security cameras did not violate any of appellant's Fourth Amendment rights.

{¶37} Based upon the totality of the circumstances, we find that entry into both the residence and the backyard curtilage was justified by the community-caretaking/emergency aid exception to the warrant requirement. *See State v. Methvin, supra*, at ¶ 21. As such, we find no merit to appellant's claims that the exclusionary rule demanded suppression of his cell phone, its contents, Robyn Mack's statements about possible security software on the phone, as well as officers' observations about the backyard. Accordingly, appellant's first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

{¶38} In his second assignment of error, appellant contends that the trial court erred when it held that the consent exception to the warrant requirement permitted Whitney Mack to lawfully consent to the second, third, and fourth

warrantless searches of appellant's home. Appellant specifies that the second and third searches occurred on February 25, 2021, while the fourth search occurred on March 1, 2021. The State responds by arguing that Whitney Mack, who resided in appellant's home, had authority to consent to all three searches. Thus, the State contends there was no error by the trial court in reaching its decision.

## Standard of Review

{¶39} The same standard of review set forth under our analysis of appellant's first assignment of error also applies here. Also, as in the first assignment of error, appellant challenges the application of the law to the trial court's findings of fact, specifically it's finding that Whitney Mack had authority to provide consent to both enter and search. Thus, the trial court's findings are subject to a de novo review. *See State v. Street*, *supra*, at ¶ 14; *see also State v. Stengel, supra*, at ¶ 21.

## Legal Analysis

{¶40} Appellant contends that Whitney Mack lacked both actual and apparent common authority to permit law enforcement to enter his house and his bedroom on the dates listed above. He argues that she did not have mutual use or joint access or control of most of the home or his bedroom. He points to the fact that she had no signed lease and did not pay rent or help with utilities. He concedes that she utilized his bedroom area to do her laundry and "get snacks." He

also argues that because he had instructed her not to be in the house between 8:00 a.m. and 5 p.m. on February 25, 2021, that she had no authority to be in the house during that time.

{¶41} Generally, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). It is a fundamental Fourth Amendment principle, however, that neither a search warrant nor probable cause is required if valid consent to search, an exception to the constitutional requirements, is given. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). In *United States v. Matlock*, 415 U.S. 164, 171-72 (1974), the Supreme Court held that when the government seeks to justify a warrantless search by proof of voluntary consent, in the absence of proof that consent was given by the defendant, it "may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected."

{¶42} In describing what constitutes common authority, the Supreme Court explained, "[c]ommon authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property [.]" *Id.* at 171. Rather, the Court said, common authority rests

> on mutual use of the property by persons generally having joint
> access or control for most purposes, so that it is reasonable to

recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.*

{¶43} We agree with the trial court's determination that appellant's niece, Whitney Mack, had actual, common authority to consent to both entry and a search of appellant's residence on all occasions. She testified that she was a student and had lived at the residence with appellant for several months. She testified that she had her own bedroom there, had a key, and knew the passcode for the security system. She further testified that although appellant's bedroom was located in the basement, that space also served as the laundry room, housing the washer and dryer. She testified that she was permitted access to that area of the house not only to do laundry, but also to get snacks, which appellant kept in his bedroom. She further testified that the only door into the garage was located in that room.

{¶44} Moreover, even if a third party does not possess common authority to consent to a search, the Fourth Amendment is not violated if the police reasonably relied on the third party's apparent authority to consent. *See State v. French*, 2020-Ohio-3653, ¶ 20 (5th Dist.), citing *State v. Norman*, 2014-Ohio-5084, ¶ 38 (12th Dist.). Apparent authority is judged by an objective standard. *Id.* A warrantless search based on apparent authority to consent is permissible if " 'the facts available to the officer at the moment [would] "warrant a man of reasonable

caution in the belief" that the consenting party had authority over the premises.' "
*French* at ¶ 20, quoting *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990), in turn
quoting *Terry v. Ohio*, 392 U.S. 1, 21-22 (1968).

{¶45} There was testimony at the hearing that law enforcement had been
called to appellant's residence the day prior when Whitney had a problem with the
security alarm. Deputy Owen Ross had been dispatched for the security alarm
issue and met with Whitney, who informed him she lived there and was in college.
Deputy Ross was also at the residence on February 25, 2021, along with Deputy
Ady and Detective Masi. He testified that when Whitney arrived at the residence
on February 25, 2021, he knew that she lived there. Thus, even if Whitney lacked
actual common authority, she had apparent authority to consent to entry on
February 25, 2021. With respect to the fourth search, which occurred several days
later, her status as a resident remained the same in the eyes of law enforcement.
Appellant had done nothing to dispel the idea that she was allowed to be in the
house. She still had a key and had access to the house. Thus, she had both actual
and apparent common authority to consent to both entry and a search.

{¶46} In reaching this decision, we reject appellant's assertion that because
he had told Whitney to be out of the house between the hours of 8:00 a.m. and 5:00
p.m. on February 25, 2021 that she lacked authority to provide consent. She was
told that she needed to be out due to appliance and Wi-Fi repair technicians

coming. This request did not revoke her mutual use or joint access and control of the property. We further reject his argument that because she had no signed lease and did not pay rent or utilities she lacked either common or apparent authority. As set forth above, common authority does not rest on the law of property and is not based upon property interests, rather it rests on mutual use. *See Matlock, supra*, at 171-172. The record plainly demonstrates that appellant had granted Whitney mutual use of the property and that she had joint access or control for most purposes. Thus, appellant ran the risk that she might permit the common area to be searched, which she did.

{¶47} In light of the foregoing, we find no merit to the arguments raised under appellant's second assignment of error. Accordingly, it is overruled.

## ASSIGNMENT OF ERROR III

{¶48} In his third assignment of error, appellant contends that the trial court erred when it denied his motion to suppress what he claims were unconstitutional searches conducted via invalid warrants. Appellant argues that the search warrants for his cell phone, iPad, residence, and security system records were all invalid and thus, the results of the searches must be excluded. Appellant further argues that the good-faith exception to the exclusionary rule did not apply here, primarily because the warrants at issue "set no bounds on the search and potential seizures"

and, therefore, "no reasonable officer could presume that such a warrant was valid."

{¶49} The State responds by arguing that the four corners of the warrant stated with particularity the items to be searched, the purpose for the search, and what was being sought. The State points out that although the warrants themselves may have lacked particularity, the affidavits that were attached and incorporated by reference into the warrants particularly described what was being sought. Therefore, the State argues that the warrants did, in fact, "guide and control" the search and did not give law enforcement a fishing license to search anything and everything.

Standard of Review

{¶50} As with the arguments raised under appellant's first and second assignments of error, these arguments were raised below through a motion to suppress. Thus, the same standard of review that was set forth above also applies here. In addition, we note that with respect to the issuance of warrants "due weight should be given 'to inferences drawn from those facts by resident judges and local law enforcement officers.' " *State v. Grace*, 2023-Ohio-3781, ¶ 23 (5th Dist.), quoting *Ornelas v. United States*, 517 U.S. 690, 698 (1996). *See also State v. Hikec*, 2024-Ohio-1940, ¶ 17 (5th Dist.). Moreover, if a reviewing court determines that a warrant should not have been issued, it must then determine

whether the good-faith exception applies. That question is a question of law subject to de novo review by the appellate court. *Grace, supra*, at ¶ 24, citing *State v. Castagnola*, 2015-Ohio-1565, ¶ 32, in turn citing *United States v. Leary*, 846 F.2d 592, 606 (10th Cir. 1988).

Requirement for Obtaining a Warrant Before Conducting a Search

{¶51} The Fourth Amendment to the United States Constitution, applied to the states through the Fourteenth Amendment, provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or other things to be seized.

Article I, Section 14 of the Ohio Constitution similarly provides as follows:

> The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched and the person and things to be seized.

*See also* R.C. 2933.22(A); Crim.R. 41(C).

{¶52} In *Carpenter v. United States*, the United States Supreme Court observed as follows:

> The Founding generation crafted the Fourth Amendment as a "response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence

of criminal activity." *Riley v. California*, 573 U.S. 373, 403, 134 S.Ct. 2473, 2494, 189 L.Ed.2d 430 (2014). In fact, as John Adams recalled, the patriot James Otis's 1761 speech condemning writs of assistance was "the first act of opposition to the arbitrary claims of Great Britain" and helped spark the Revolution itself. *Id.*, at 403 (quoting 10 Works of John Adams 248 (C. Adams ed. 1856)).

585 U.S. 296, 303-304 (2018).

{¶53} "To be valid, a search warrant application must show more than that a person connected with a property is suspected of a crime." *Grace* at ¶ 39, citing *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). It must also establish that "there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Grace* at ¶ 39, quoting *Zurcher* at 556. Thus, in order for a search warrant to issue, "the evidence must be sufficient for the magistrate to conclude that there is a fair probability that evidence of a crime will be found in a particular place." *Grace* at ¶ 40. The reviewing court then must ensure that the magistrate had a substantial basis for concluding that probable cause existed. *Id.*, citing *State v. Castagnola*, 2015-Ohio-1565, ¶ 35, in turn citing *State v. George*, 45 Ohio St.3d 325, 329 (1989). *See also Illinois v. Gates*, 462 U.S. 213, 238-239 (1983) and *Jones v. United States*, 362 U.S. 257, 271 (1960). Probable cause is defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). It requires "only a probability

or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, *supra*, at 243, fn. 13 (1983).

{¶54} The Supreme Court of Ohio expanded upon the particularity required when seeking and issuing warrants, explaining that " ' "[t]here is interplay between probable cause, particularity, and reasonableness." ' " *State v. Castagnola, supra*, at ¶ 70, quoting *State v. Castagnola*, 2013-Ohio-1215, ¶ 46 (9th Dist.)(Carr, J., dissenting), in turn quoting *In re Appeal of Application for Search Warrant*, 193 Vt. 51, ¶ 33 (2012). The Court went on to reiterate that "the Fourth Amendment to the United States Constitution provides, '[n]o Warrants shall issue * * * [except those] particularly describing the place to be searched, and the persons or things to be seized.' " *State v. Castagnola*, 2015-Ohio-1565, at ¶ 72.

{¶55} The Court further stated as follows in *Castagnola*:

> Courts addressing the particularity requirement of the Fourth Amendment are concerned with two issues. The first issue is whether the warrant provides sufficient information to "guide and control" the judgment of the executing officer in what to seize. *United States v. Upham*, 168 F.3d 532, 535 (1st Cir.1999). The second issue is whether the category as specified is too broad in that it includes items that should not be seized. *See United States v. Kow*, 58 F.3d 423, 427 (9th Cir.1995).

> A search warrant that includes broad categories of items to be seized may nevertheless be valid when the description is " ' "as specific as the circumstances and the nature of the activity under investigation permit." ' " *Guest v. Leis*, 255 F.3d 325, 336 (6th Cir.2001), quoting *United States v. Henson*, 848 F.2d 1374, 1383 (6th Cir.1988), quoting *United States v. Blum*, 753 F.2d 999, 1001 (11th Cir.1985). Warrants that fail to describe the

items to be seized with as much specificity as the government's knowledge and the circumstances allow are "invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized." *United States v. Fuccillo*, 808 F.2d 173, 176 (1st Cir.1987).

*Id.* at ¶ 79-80.

{¶56} Although the *Castagnola* Court ultimately found that a search of the defendant's computer was invalid in that the search warrant lacked the particularity required under the Fourth Amendment, it also specifically stated "that the Fourth Amendment does not require a search warrant to specify restrictive protocols." *Id.* at ¶ 88. *See also State v. Gornall*, 2016-Ohio-7599, ¶ 28 (5th Dist.). Instead, the Court explained as follows:

> The logical balance of these principles leads to the conclusion that officers must describe what they believe will be found on a computer with as much specificity as possible under the circumstances. This will enable the searcher to narrow his or her search to only the items to be seized. Adherence to this requirement is especially important when, as here, the person conducting the search is not the affiant. *See generally United States v. Gahagan*, 865 F.2d 1490, 1498-1499 (6th Cir.1989).

*Castagnola* at ¶ 88.

## Good Faith

{¶57} The "good faith exception" to the exclusionary rule is set forth in *United States v. Leon*, 468 U.S. 897 (1984), and was adopted by the Ohio Supreme Court in *State v. Wilmoth*, 22 Ohio St.3d 251 (1986). Under the "good faith exception," the exclusionary rule should not be applied so as to bar the use in the

prosecution's case-in-chief of evidence obtained by officers acting in objectively reasonable reliance on a search warrant issued by a detached and neutral magistrate but ultimately found to be unsupported by probable cause. *See State v. George*, 45 Ohio St.3d 325, 330, 544 N.E.2d 640 (1989), citing *Leon, supra* at 918-23. However, even under the "good faith exception," suppression of evidence is appropriate where any of the following occurs:

> * * * the magistrate or judge * * * was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth * * *; (2) * * * the issuing magistrate wholly abandoned his judicial role * * *; (3) an officer purports to rely upon * * * a warrant based upon an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) * * * depending on the circumstances of the particular case, a warrant may be so facially deficient-i.e. in failing to particularize the place to be searched or the things to be seized-that the executing officers cannot reasonably presume it to be valid.

*Leon, supra,* at 923.

{¶58} An affidavit is "bare bones" when it fails to establish a minimally sufficient nexus between the item or place to be searched and the underlying illegal activity. *State v. Schubert*, 2022-Ohio-4604, ¶ 9, citing *United States v. McPhearson*, 469 F.3d 518, 526 (6th Cir. 2006). The Court in *Schubert* noted as follows:

> To avoid being labeled as "bare bones," an affidavit must state more than " 'suspicions, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge,' " *United States v. Christian*,

925 F.3d 305, 312 (6th Cir. 2019), quoting *United States v. Washington*, 380 F.3d 236, 241 (6th Cir. 2004), fn. 4, and make " 'some connection,' " *id.* at 313, quoting *White* at 497, " 'between the illegal activity and the place to be searched[.]' " *id.*, quoting *United States v. Brown*, 828 F.3d 375, 385 (6th Cir. 2016).

*Schubert* at ¶10.

## Legal Analysis

{¶59} Appellant challenges the validity of the warrants for several different searches that took place. We will address them individually in the order set forth in appellant's brief.

### 1. Warrant to Search Cell Phone Issued by the Shelby County Municipal Court

{¶60} Appellant contends that the affidavit and subsequent warrant to search his cell phone that was issued in the early hours of February 26, 2022 by the Shelby Municipal Court violated the particularity requirement detailed in *Castagnola*. He argues that the warrant included no direction to the executing officer as to what to search for and instead only contained boilerplate language. He further argues that the warrant granted law enforcement a "fishing license" to explore the entirety of the contents of his phone. Additionally, he essentially argues that the warrant should have specified that the search should be limited to only the home security video footage. Finally, appellant contends that the good faith exception to the exclusionary rule did not apply because "no reasonable

officer could presume that a warrant setting no parameters for what is to be searched and seized was valid."

{¶61} After reviewing the record, we find no merit to the arguments raised by appellant. The warrant that was issued specified that the affidavit filed in support of the warrant was attached to the warrant and was incorporated therein. The affidavit detailed the facts we have already found constituted exigent circumstances for warrantless entry into appellant's home. The affidavit further described the discovery of appellant's phone and the grounds for the belief that security camera footage from his home existed and could be found on a "downloaded app" on his phone. The affidavit further stated as follows:

> At this time officers are seeking authorization to search John H. Mack Jr. [sic] iPhone 8+ cell phone in order to gain access to his home security videos which will confirm whether or not Melinda was at the residence and if so it will show who left the residence in her vehicle.

The affidavit listed the crimes believed to be connected to the warrant request, which included abduction, kidnapping, and assault. It further specifically described the device to be searched as:

> The iPhone 8+ cellular device owned and operated by John Henry Mack, Jr., SSN: [], DOB: March 2, 1977 who resides at 592 Cliffside Dr. Mansfield, OH 44904 with the listed telephone number of (419) 989-7476 Provided [sic] by Sprint with a device serial number of FD3XN0W6JCLP and a Model Number of MQ9J2LL/A.

{¶62} Here, the warrant at issue expressly incorporated the affidavit by reference, specified the device to be searched, the information being sought and the reason therefore, and where the information could be found on the phone. Although it did not state that the search should be limited to the app only, *Castagnola* makes clear that restrictive protocols were not required to be included in the warrant. Moreover, Sergeant Scott, who both sought the warrant and executed the warrant, testified that the only information reviewed pursuant to that particular warrant was the security camera footage contained on the downloaded app. Based upon these facts, we conclude that the affidavit and warrant, when read together, met the Fourth Amendment's particularity requirement. *See State v. Bugno*, 2022-Ohio-2008, ¶ 33-34 (7th Dist.) (explaining that a supporting affidavit may be read together with, and considered a part of, a warrant that otherwise lacks particularity "if the warrant uses appropriate words of incorporation, and if the supporting document accompanies the warrant"), citing *Groh v. Ramirez*, 540 U.S. 551, 557-558 (2004); *United States v. Hurwitz*, 459 F.3d 463, 470-471 (4th Cir. 2006); *see also State v. Craw*, 2018-Ohio-1769, ¶ 32 (3d Dist.) (recognizing that the Fourth Amendment requires particularity in the warrant, not the supporting documents, but acknowledging that "warrants may satisfy the particularity requirement by being interpreted with reference to an affidavit incorporated into the warrant or physically attached thereto").

{¶63} In light of the foregoing, we find no merit to appellant's argument that the trial court erred in denying his motion to suppress the results of the search of his cell phone by the Shelby Police Department, which was conducted pursuant to a warrant issued by the Shelby Municipal Court on February 26, 2022.

### 2. Warrant to Search Cell Phone Issued by the Mansfield Municipal Court

{¶64} Appellant also contends that the warrant that was issued by the Mansfield Municipal Court to search his cell phone lacked particularity. He argues that the description of what was to be searched "gave the executing officer free rein, which was impermissible under *Castagnola*[,]" and further that rather than referencing specific criminal offenses, it listed "Missing Person," "Suspected Foul Play," and "Suspicious Circumstances," as the grounds supporting the request. Appellant argues that these grounds constituted "inferences impermissibly asserted as empirical facts, thereby usurping the inference-drawing authority of the magistrate." He also argues that the good-faith exception to the exclusionary rule does not apply here. The State responds by arguing that the warrant and affidavit is support thereof were "as specific as possible considering the circumstances and early nature of the investigation and frantic efforts to find Melinda Davis."

{¶65} We first address appellant's argument that the warrant was somehow flawed, or lacked particularity, because it did not list specific criminal offenses. Crim.R. 41(C) provides that a search-warrant affidavit "shall name or describe the

person to be searched or particularly describe the place to be searched * * * [and] state substantially the offense in relation thereto and state the factual basis for the affiant's belief that such property is there located." *See also* R.C. 2933.23. It has been held that "[p]robable cause to search does not require proof that a crime was actually committed, merely the fair probability that evidence of a crime will be found at the location described." *State v. Beauford*, 2023-Ohio-3782, ¶ 12 (9th Dist.), citing *State v. McKnight*, 2005-Ohio-6046, ¶ 41.

{¶66} The affidavit filed in support of this warrant request, which was expressly incorporated by reference into the warrant, stated that the victim had gone to appellant's house at 9:00 a.m. on February 25, 2021 and had informed a friend of her whereabouts and told that friend to call the police if she didn't hear from her in two hours. The affidavit further stated that the victim thereafter failed to show up for a scheduled lunch, had essentially gone missing, and that her last reported known location was appellant's residence. Though the affidavit did not specify certain crimes, it did provide that "Substantially stated, the offenses in relation thereto are: 1. Missing Person, 2. Suspected Foul Play, and 3. Suspicious Circumstances."

{¶67} The *McKnight* court observed that while Crim.R. 41(C) "requires a substantial statement of the offense in relation to the property to be seized," it does not require "the specific code number or title of that offense." *Id.* at ¶ 40.

Moreover, "the 'failure to specify the offense to which the evidence is related by name or code section in the affidavit is not constitutionally significant' and does not require suppression of evidence seized pursuant to a warrant." *Id.*, quoting *Cleveland v. Becvar*, 63 Ohio App.3d 163, 166 (8th Dist. 1989). Based upon this reasoning, we reject appellant's argument that the failure to list specific offenses invalidated the warrant.

{¶68} We next address appellant's argument that the warrant lacked particularity, was overbroad, and failed to guide and control what could be searched and seized. Admittedly, the language in the warrant allowed law enforcement to search the phone for "[a]ll information * * * including but not limited to machine-readable data, all previously erased data, and any personal communications * * *," "[a]ny and all communications in electronic form," which included email, text, and messenger, as well as "[a]ny and all data contained on the device," including previously erased data, and also video, photos, and audible messages. Here, law enforcement was looking for "any and all possible information that would lead to locating Melinda Davis." *Castagnola* specifically states that "[a] search warrant that includes broad categories of items to be seized may nevertheless be valid when the description is ' " 'as specific as the circumstances and the nature of the activity under investigation permit.' " ' " *Castagnola* at ¶ 80, quoting *Guest v. Leis*, *supra*, at 336, quoting *United States v.*

*Henson*, *supra*, at 1383, in turn quoting *United States v. Blum*, *supra*, at 1001. Thus, we accept the State's argument and conclude that considering the circumstances and early nature of the investigation, which included an active and urgent missing-persons investigation, the warrant was as specific as possible and did not run afoul of *Castagnola*. Accordingly, we find no merit in this portion of appellant's argument under his third assignment of error.

### 3. Warrants to search iPads

{¶69} Appellant challenges two warrants issued to search two different iPads owned by him. His challenges are based upon the same grounds raised in relation to the searches of his cell phone. For the same reasons we found no merit to the arguments related to the search of his cell phone, we find no merit to this argument either.

### 4. Warrants to Search Residence

{¶70} Appellant first argues that the warrants to search his house were invalid for the same reasons he argues that the warrants to search his cell phone and iPads were invalid, namely that they lacked particularity, were overbroad, and failed to specify the particular crimes in relation to the property to be seized. He incorporates his arguments as to the warrants for both his phone and iPads to the warrant for the search of his house. For the same reason we rejected appellant's argument that the warrant was invalid for failure to state a specific criminal

offense, we also reject that argument as to the search warrant for the search of his residence. However, as challenges to warrants are very fact specific and in the absence of specific arguments, we will not attempt to divine appellant's specific challenges to the particularity, breadth, or overbreadth of the warrant issued with respect to his house. It is not this court's responsibility to root out arguments on behalf of appellant. *See State v. Miller*, 2019-Ohio-4121, ¶ 39 (3d Dist.), citing *State v. Raber*, 2010-Ohio-4066, ¶ 30 (9th Dist.) ("[I]f an argument exists that can support [an] assignment of error, it is not this [c]ourt's duty to root it out."). *See also* App.R. 12(A)(2) and 16(A)(7). Thus, as he has failed to specifically and separately argue in what manner the search warrants for his house lacked particularity or were overbroad, we reject his assertion that the warrant was invalid or that the results of the search should have been suppressed on those grounds.

{¶71} Appellant further argues, however, that "the inference-drawing authority of the magistrate was usurped" when the affiant misreported the victim's friend's statement that the victim told her she was going to appellant's house and further stated "if I don't call you in a few hours, something might be wrong[,]" as instead stating "call the police if you don't hear from me in two hours." Appellant contends that the phrase " 'something might be wrong,' on its own terms, does not connote potential criminal activity." Appellant argues that the actual text

communication sent by the victim to her friend "does not allow for reasonable inference" of criminal activity.

{¶72} The State initially contends that appellant failed to raise this inference argument below and has thus waived it for purposes of appeal. However, our review of the record indicates that appellant did, in fact, raise this argument in his January 3, 2022, Motion to Suppress. Thus, the argument has not been waived. Nevertheless, we find no merit to it.

{¶73} In *Castagnola*, the Court not only addressed the particularity requirements of the Fourth Amendment, it also addressed the issue of inferences, noting that "[c]ourts have held that affiants may make reasonable inferences within search-warrant affidavits." *Castagnola, supra*, at ¶ 39. *Castagnola* explained in further detail, as follows:

> Courts have recognized that affidavits that include a factual narrative will inevitably include a number of inferences drawn by the affiant. *People v. Caffott*, 105 Cal.App.3d 775, 782, 164 Cal.Rptr. 499 (1980). However, "the magistrate must be afforded the opportunity to test any significant inference drawn by the affiant." *People v. Smith*, 180 Cal.App.3d 72, 87, 225 Cal.Rptr. 348 (1986). The facts upon which those inferences are based must be disclosed to permit a magistrate's independent review. *State v. Bean*, 13 Ohio App.3d 69, 74, 468 N.E.2d 146 (6th Dist.1983). *See also State v. Garza*, 2013-Ohio-5492, 5 N.E.3d 89, ¶ 25 (3d Dist.).

> Similarly, magistrates may make reasonable inferences when deciding whether probable cause exists to issue a warrant. [*Illinois v. Gates*, 462 U.S. 213, 240 (1983)]; *State v. Hobbs*, 133 Ohio St.3d 43, 2012-Ohio-3886, 975 N.E.2d 965, ¶ 10; *State v.*

*Jordan*, 11th Dist. Lake No. 97-L-211, 1998 WL 684231, *3 (Sept. 25, 1998) (O'Neill, J., dissenting). However, a magistrate cannot be viewed as neutral and detached if the magistrate issues a search warrant that is unknowingly based on the police officer's conclusions. *See State v. Joseph*, 25 Ohio St.2d 95, 96, 267 N.E.2d 125 (1971).

*Castagnola* at ¶ 40-41.

{¶74} *Castagnola* further explained that "[w]hile search-warrant affidavits will inevitably include undisclosed inferences, under the Fourth Amendment analysis, there is ' "a line between permissible police interpretation and usurpation of the magistrate's function." ' " *Id.* at ¶ 49, quoting *Caffott* at 782, in turn quoting *Rodriguez v. Superior Court*, 87 Cal.App.3d 822, 831, fn. 3 (1978). Importantly, the Court further drew a distinction between "undisclosed inferences" that were simply false, as opposed to being "presented as empirical fact." *Id.* The Court stated that "[i]f the defendant alleges only that the statement of fact (which is actually an undisclosed inference) is false, then the trial court should apply the established rules for factual statements and omissions." *Id.*

{¶75} Here, a close reading of appellant's argument reveals that he is actually arguing that the affiant included a statement that was false (i.e., that the victim said call the police if you don't hear from me within two hours rather than what the victim actually said, which was if you don't hear from me within a few hours, something might be wrong), not that the affiant presented that statement as an empirical fact, thus making his own inferences and thereby usurping the

magistrate's inference-drawing authority. Therefore, under *Castagnola*, this Court should apply the established rules for misstatements and omissions. *See Castagnola* at ¶ 49, citing *Caffott* at 782.

{¶76} This misstatement was discussed at length during the suppression hearing. It is clear that the statement made by the victim to her friend, Paula Littlefield, was initially reported to Detective Ady, who was one of the first officers to arrive on the scene. During the suppression hearing, Detective Ady testified that he relayed the victim's statement to Captain Zehner. He testified that he essentially paraphrased the statement as being that if Littlefield had not heard from the victim by 12:00 or 1:00, to call the police. That then was the message that got relayed to all other personnel during the investigation and was the source of the false statement, or misstatement, which carried through to the affidavits filed in support of the warrant requests.

{¶77} During the suppression hearing, the trial court found that the affiant had relayed what had been told to him and that he had not seen the actual text message contained on Littlefield's phone. The trial court made no finding that the affiant intentionally or recklessly disregarded truth in including the statement as reported to him, despite its inaccuracy. Importantly, the trial court found that "[a]lthough the text messages themselves do not exactly match the statement in the affidavit, the essence of the message was the same." We conclude the trial court

reached the correct decision. Excising the incorrect information from the affidavit and replacing it with the actual language used in victim's text message does not negate in any way the magistrate's probable cause determination. (Citations omitted). *See State v. Bingham*, 2019-Ohio-3324, ¶ 20 (3d Dist.) (" '[A] warrant * * * is still valid unless, "with the affidavit's false material set to one side [or with the omissions included], the affidavit's remaining content is insufficient to establish probable cause * * * " ' ").

{¶78} In light of the foregoing, we find no merit to appellant's argument that the affidavits filed in support of the search warrants that were issued to search his house on two separate occasions contained impermissible inferences that invalidated the warrants.

### 5. Warrant to Search Security System Records

{¶79} As with the prior argument, Appellant simply incorporates by reference his prior arguments regarding the alleged deficiencies related to the other warrants, apparently claiming that the warrant issued to search his security system records lacked particularity, was overbroad, and was based upon impermissible inferences contained in the affidavit filed in support of the warrant. He sets forth no individualized arguments in relation to the security system records and presents no specific facts or arguments related to the search of these records. As such, upon the authority contained in *State v. Raber, supra*, as well as App.R. 12(A)(2) and

16(A)(7), we decline to address this portion of appellant's third assignment of error. See App.R. 12(A)(2) ("The court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A).").

{¶80} Having found no merit to any of the arguments raised under appellant's third assignment of error, it is overruled in its entirety.

## ASSIGNMENT OF ERROR IV

{¶81} In his fourth assignment of error, appellant contends that the trial court erred in denying his motion to dismiss based upon speedy trial grounds. We disagree.

### Standard of Review

{¶82} Speedy trial provisions are mandatory and are encompassed within the Sixth Amendment to the United States Constitution. The availability of a speedy trial to a person accused of a crime is a fundamental right made obligatory on the states through the Fourteenth Amendment. *State v. Ladd*, 56 Ohio St.2d 197, 200 (1978). "The statutory speedy trial provisions, R.C. 2945.71 et seq., constitute a rational effort to enforce the constitutional right to a public speedy trial of an accused charged with the commission of a felony or a misdemeanor and shall

be strictly enforced by the courts of this state." *State v. Pachay*, 64 Ohio St.2d 218 (1980), syllabus.

{¶83} Our review of a trial court's decision regarding a motion to dismiss based upon a violation of the speedy trial provisions involves a mixed question of law and fact. *State v. Larkin*, 2005-Ohio-3122, ¶ 11 (5th Dist.). As an appellate court, we must accept as true any facts found by the trial court and supported by competent, credible evidence. *State v. Taylor*, 2016-Ohio-5912, ¶ 43 (5th Dist.), citing *Larkin, supra*. With regard to the legal issues, however, we apply a de novo standard of review and thus freely review the trial court's application of the law to the facts. *Id.* When reviewing the legal issues presented in a speedy trial claim, we must strictly construe the relevant statutes against the State. *Brecksville v. Cook*, 75 Ohio St.3d 53, 57 (1996); *State v. Colon*, 2010-Ohio-2326, ¶ 12 (5th Dist.).

{¶84} Appellant was charged with felony offenses. A person charged with a felony must be brought to trial within 270 days unless the right to a speedy trial is waived. R.C. 2945.71(C)(2). If a person is held in jail in lieu of bond, then each day that the suspect is in custody counts as 3 days. R.C. 2945.71(E). Appellant remained incarcerated throughout the proceedings. Pursuant to R.C. 2945.71(C)(2), the State had 270 days to try Appellant, subject to the triple-count provision of 2945.71(E) and barring any tolling events. Pursuant to R.C. 2945.73,

a person who is not brought to trial within the proscribed time periods found in R.C. 2945.71 and R.C. 2945.72 "shall be discharged" and further criminal proceedings based on the same conduct are barred.

{¶85} A defendant establishes a prima facie case for discharge once he demonstrates that he has not been brought to trial within the time limits set forth in R.C. 2945.71. *State v. Ashbrook*, 2007-Ohio-4635, ¶ 49 (5th Dist.), citing *State v. Butcher*, 27 Ohio St.3d 28, 30-31 (1986). When an appellant has established that he was tried outside speedy-trial time limits, the burden shifts to the State to show that the time limit was extended. *Id.* at ¶ 31. If the State fails to produce evidence in rebuttal under R.C. 2945.72, then discharge pursuant to R.C. 2945.73(B) is required. *Id.*

{¶86} Additionally, an accused may waive his rights to a speedy trial, so long as the waiver is knowingly and voluntarily made. *See State v. O'Brien*, 34 Ohio St.3d 7, 9 (1987), citing *Barker v. Wingo*, 407 U.S. 514 (1972). Such a waiver must be in writing or expressly made on the record in open court. *State v. King*, 70 Ohio St.3d 158 (1994), syllabus, citing *O'Brien, supra*, and *State v. Mincy*, 2 Ohio St.3d 6 (1982). "A time waiver may be limited or unlimited in duration." *State v. Miller*, 2017-Ohio-5728, ¶ 27 (5th Dist.).

{¶87} " '[A] waiver that expressly waives the accused's right to a speedy trial under the statute without mentioning a specific time period is unlimited in

duration.' " *Id.*, quoting *State v. Kovacek*, 2001 WL 577664, *4 (9th Dist. May 30, 2001), citing *O'Brien, supra*, at paragraph two of the syllabus. "Once an accused has executed an express, written waiver of unlimited duration, 'the accused is not entitled to a discharge for delay in bringing him to trial unless the accused files a formal written objection and demand for trial, following which the state must bring the accused to trial within a reasonable time.' " *Miller, supra,* at ¶ 27, quoting *O'Brien, supra*, at paragraph two of the syllabus; *State v. Battle*, 2010-Ohio-4327, ¶ 77 (5th Dist.), appeal not allowed, 2011-Ohio-376, and cert. denied, 565 U.S. 861 (2011).

Legal Analysis

{¶88} Appellant argues that because he was incarcerated throughout the litigation below, he was entitled to the triple-count provision contained in R.C. 2945.71(E) for purposes of calculating speedy trial. He further argues that because he was not brought to trial within 90 days of his arrest, he has established a prima facie case that he was denied his right to a speedy trial. In raising these arguments, he claims that there were not enough tolling events that occurred to prevent his speedy trial argument. He further argues that although he waived his right to a speedy trial in writing, the waiver did not apply retroactively to waive any violation that had occurred prior to the execution of the written waiver.

{¶89} The State contends that although appellant was incarcerated throughout the proceedings below, he was being held on multiple charges that were pending separate trials and which involved different victims.  The State therefore argues that appellant was not entitled to the triple-count provision and that it instead had 270 days to bring him to trial.  The State contends appellant was brought to trial within that time, referencing the fact that he waived his right to a speedy trial.

{¶90} "When reviewing a speedy-trial issue, an appellate court must calculate the number of days chargeable to either party and determine whether the appellant was properly brought to trial within the time limits set forth in R.C. 2945.71." *State v. Riley*, 2005-Ohio-4337, ¶ 19 (12th Dist.).  Generally, the 90-day speedy trial clock begins the day after a defendant's arrest.  *State v. Davis*, 2013-Ohio-5311, ¶ 21, citing R.C. 1.14 and Crim.R. 45(A).  "Two key concepts direct how a court must charge the days when calculating a potential speedy trial violation:  waiver and tolling." *State v. Williams*, 2023-Ohio-1002, ¶ 16 (10th Dist.); *State v. Calo-Jimenez*, 2023-Ohio-2562, ¶ 18 (1st Dist.).  "A defendant's express waiver of a right to a speedy trial allows additional time at the defendant's request, whereas the automatic tolling of time * * * operates to protect the state's ability to adequately prosecute persons who have committed crimes." *State v. Blackburn*, 2008-Ohio-1823, ¶ 21.  "Tolling occurs by operation of law under R.C.

2945.72 under certain circumstances and the defendant is not required to agree to the tolling of time[.]" *Williams* at ¶ 16; *Calo-Jimenez* at ¶ 19. Examples of tolling events include discovery requests, motions by the defendant, continuances granted on the defendant's own motion, and any reasonable continuances granted other than upon the defendant's motion. *Id.*, citing R.C. 2945.72(E) and (H).

{¶91} In the present case, appellant was arrested and held in jail on initial charges of receiving stolen property and kidnapping on March 4, 2021. The cases were assigned different case numbers and were separately bound over to the grand jury. Although appellant was very quickly indicted on a charge of receiving stolen property in the one case, the kidnapping case was later expanded to include multiple other charges, including aggravated murder, once the victim's body was located. Appellant remained incarcerated on all charges throughout the proceedings.

{¶92} Although handled together for the most part, the two cases proceeded under different indictments and were separately set for trial. While the receiving stolen property case was ultimately dismissed on August 15, 2022, appellant was not brought to trial on the aggravated murder case until October 24, 2022. Thus, because appellant was arrested on March 4, 2021, and was not brought to trial until October 24, 2022, he has demonstrated a prima facie case for discharge. The parties herein disagree on whether, based upon these facts, appellant was entitled

to the triple-count provision in calculating his speedy trial time. We find, however, that we do not need to reach this issue in light of appellant's waiver of speedy trial time.

{¶93} As set forth above, appellant executed a written waiver of his speedy trial rights on August 5, 2021. The waiver failed to set forth a beginning time or ending time for the waiver, and instead simply stated that appellant waived his right to speedy trial and consented "to having my case tried before a judge or jury at any time in the future." There was another line at the bottom stating the case would be scheduled for trial on April 4, 2022, "by agreement of the parties and the court."

{¶94} This Court has held that " '[i]n failing to give a date certain for the beginning and ending points for tolling purposes, the waiver was effective from the date of [appellant's] arrest and was unlimited in duration.' " *State v. Miller, supra*, at ¶ 29, quoting *State v. Bray*, 2004-Ohio-1067, ¶ 9 (9th Dist.). *See also State v. Buck*, 2017-Ohio-273, ¶ 11 (9th Dist.) ("When a waiver fails to include a specific date as the starting point for the tolling of time, the waiver is deemed to be effective from the date of arrest"), citing *State v. Matland*, 2010-Ohio-6585, ¶ 47 (7th Dist.). In *Buck*, the court found that although the appellant specified an end date for the waiver, because the waiver failed to include a starting date, the waiver constituted "a waiver of all time preceding the execution of the waiver" until the

end date, beginning from the date of her arrest.  *Buck* at ¶ 11.  *See also State v. Horsley*, 2018-Ohio-1591, ¶ 28 (4th Dist.) (relying on the Fifth District's holding in *State v. Miller* to conclude a waiver failing to specify a start and end date was unlimited in duration).  As such, because appellant's speedy trial waiver failed to specify a beginning date, we conclude that the waiver was deemed to be effective from the date of arrest.

{¶95} However, an accused is entitled to revoke speedy trial waivers.  The Supreme Court of Ohio, in *State v. O'Brien, supra*, held in paragraph two of the syllabus as follows:

> Following an express, written waiver of unlimited duration by an accused of his right to a speedy trial, the accused is not entitled to a discharge for delay in bringing him to trial unless the accused files a formal written objection and demand for trial, following which the state must bring the accused to trial within a reasonable time.

Appellant herein revoked his speedy trial waiver in writing on September 23, 2022. This revocation occurred, however, during the period of a continuance of the jury trial that had been granted at the request of appellant.

{¶96} The record demonstrates that although the trial court had scheduled the jury trial in this matter to take place on April 4, 2022, based upon the agreement of the parties, appellant filed a motion to continue that jury trial on November 12, 2021.  The trial court granted appellant's motion to continue on March 2, 2022, setting a new trial date of October 24, 2022.  Therefore, despite the

fact that appellant revoked his waiver of speedy trial on September 30, 2022, because the revocation occurred during an overarching tolling event, the speedy trial clock did not restart and in fact, time continued to be tolled up to the start of the trial on October 24, 2022.

{¶97} In light of the foregoing, we cannot conclude that the trial court erred in denying appellant's motion to dismiss based upon speedy trial grounds. While simply counting the dates between the date of arrest and the date appellant was brought to trial appears to demonstrate a prima facie case for discharge, because appellant's unlimited waiver of speedy trial applied retroactively to the date of his arrest, and because appellant's revocation of his speedy trial waiver on September 30, 2022 occurred during an overarching tolling event, speedy trial time continued to be tolled until the start of trial. Accordingly, we find no merit to appellant's fourth assignment of error and it is overruled.

## ASSIGNMENT OF ERROR V

{¶98} In his fifth assignment of error, appellant contends that the trial court erred when it permitted prosecution witness, Special Agent Morgan Scarberry, to read the table of contents from "The 48 Laws of Power" book found in appellant's truck, over his objection based on Evid.R. 403(A). Although appellant concedes the evidence was relevant, he argues that it was unfairly prejudicial and should

have been excluded for its inflammatory effect. He further argues that its admission did not constitute harmless error.

{¶99} The State contends the book explained appellant's premeditation to kill the victim and appealed to the jury's intellect, not its emotions or sense of horror, and therefore was not barred under Evid.R. 403(A). The State further argues that even if the evidence was improperly admitted, its admission constituted harmless error in light of the remaining evidence of appellant's guilt, which it argues was overwhelming.

Standard of Review

{¶100} The admission or exclusion of evidence lies in a trial court's sound discretion "so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake County*, 58 Ohio St.3d 269, 271 (1991); *State v. Sage*, 31 Ohio St.3d 173, (1987). "Abuse of discretion" means an attitude that is unreasonable, arbitrary or unconscionable. *Huffman v. Hair Surgeon, Inc.*, 19 Ohio St.3d 83, 87 (1985). "Most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *State v. Burton*, 2025-Ohio-2267, ¶ 42 (5th Dist.), citing *AAAA Ent., Inc. v. River Place Community Urban Redev. Corp.*, 50 Ohio St.3d 157, 161 (1990). "An unreasonable decision is one backed by no sound reasoning process that would support that decision." *Id.* " 'It is not enough that

the reviewing court, were it deciding the issue de novo, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result.' " *Id*.

Legal Analysis

{¶101} The record reveals that once appellant was apprehended and his vehicle was searched, a book entitled "The 48 Laws of Power" was recovered. The State sought admission of some of the contents of the book at trial in order to demonstrate premeditation. Appellant objected to the admission under Evid.R. 403(A) and the trial court held a sidebar on the issue before ultimately allowing admission of the evidence.

{¶102} Appellant concedes on appeal that the evidence at issue was relevant, "given the superficial connection between some of the laws and the facts of this case," but argues that the probative value was negligent in comparison to the danger of unfair prejudice. More specifically, appellant argues that the book's vague references to "crushing" one's enemy or "total annihilation," without promoting specific lawless action, "arouse[d] the jury's emotional sympathies, evoke[d] a sense of horror, or appeale[d] to an instinct to punish," and therefore should have been excluded under Evid.R. 403(A). Appellant further contends that the error in admission of the evidence was not harmless in light of the fact that he "vigorously disputed" the premeditation element of the murder charge. Appellant

suggests the evidence against him was not overwhelming and cites other evidence in the record indicating there was no ill will between himself and the victim. He also points to the existence of "blood splatter in the hallway," which he claims "indicated a 'spur of the moment' " event, rather than a premeditated one.

{¶103} The State contends on appeal that appellant manipulated the victim to come to his home alone to pick up an item of sentimental value and manipulated his niece to leave the house under false pretenses so he could kill the victim. The State argues that the book at issue "taught [appellant] how to manipulate other people to achieve his goals," and "explains Mack's premeditation to kill [the victim] using selective honesty and generosity to disarm [his] victim and then crush[] [his] enemy totally."[4] The State further argues that the evidence at issue appealed to the jury's intellect, not emotion or sense of horror, and therefore it was not barred by Evid.R. 403(A). The State also argues that even assuming the evidence was improperly admitted, the admission constituted harmless error due to the remaining overwhelming evidence of appellant's guilt.

{¶104} Evid.R. 403(A) provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." In reaching a

---

[4] Selective honestly, generosity, and crushing the enemy are principles or "laws" referenced in the book that were read into the record by Special Agent Scarberry.

decision involving admissibility under Evid.R. 403(A), a trial court must engage in a balancing test to ascertain whether the probative value of the offered evidence outweighs its prejudicial effect. *State v. Perrine*, 2024-Ohio-6082, ¶ 21 (5th Dist.); *State v. Timms*, 2022-Ohio-3010, ¶ 50 (5th Dist.); *State v. Morris*, 2021-Ohio-2646, ¶ 71 (5th Dist.), reversed on other grounds in *State v. Morris*, 2022-Ohio-4609. In order for the evidence to be deemed inadmissible, its probative value must be minimal and its prejudicial effect great. *See State v. Morales*, 32 Ohio St.3d 252, 258, (1987). *See also State v. Hartman*, 2020-Ohio-4440, ¶ 31 (explaining that "[a]s the importance of the factual dispute for which the evidence is offered to the resolution of the case increases, the probative value of the evidence also increases and the risk of *unfair* prejudice decreases"). Furthermore, relevant evidence which is challenged as having probative value, but that is substantially outweighed by its prejudicial effects, "should be viewed in a light most favorable to the proponent of the evidence, maximizing its probative value and minimizing any prejudicial effect" to the party opposing its admission. *State v. Maurer*, 15 Ohio St.3d 239, 265 (1984).

{¶105} This Court recently observed as follows:

"As a legal term, 'prejudice' is simply '[d]amage or detriment to one's legal rights or claims.' Black's Law Dictionary (8th Ed.1999) 1218. Thus, it is fair to say that all relevant evidence is prejudicial. That is, evidence that tends to disprove a party's rendition of the facts necessarily harms that party's case. Accordingly, the rules of evidence do not attempt to bar all

prejudicial evidence—to do so would make reaching any result extremely difficult. Rather, only evidence that is unfairly prejudicial is excludable.

' "Exclusion on the basis of unfair prejudice involves more than a balance of mere prejudice. If unfair prejudice simply meant prejudice, anything adverse to a litigant's case would be excludable under Rule 403. Emphasis must be placed on the word 'unfair.' Unfair prejudice is that quality of evidence which might result in an improper basis for a jury decision. Consequently, if the evidence arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish, the evidence may be unfairly prejudicial. Usually, although not always, unfairly prejudicial evidence appeals to the jury's emotions rather than intellect." ' *Oberlin v. Akron Gen. Med. Ctr.* (2001), 91 Ohio St.3d 169, 172, 743 N.E.2d 890, quoting Weissenberger's Ohio Evidence (2000) 85-87, Section 403.3."

*State v. Johnson*, 2022-Ohio-4344, ¶ 113 (5th Dist.), quoting *State v. Crotts*, 2004-Ohio-6550, ¶ 23-24.

{¶106} After a review of the record, applying the foregoing principles, and taking into consideration the arguments of both parties, including the cases each has relied upon, we find the probative value of the evidence at issue was not substantially outweighed by the danger of unfair prejudice. We conclude the evidence at issue had more than negligent probative value, as argued by appellant. We agree with the State's position that the contents of the book were probative of appellant's premeditated actions in luring the victim to his home for a specific purpose which he knew was important to her. The contents of the book were also

probative of the actions appellant took to ensure his niece would not be present in the home at the time he expected the victim to arrive.

{¶107} Although not argued by either party, appellant's niece testified that not only did appellant tell her to be out of the house because the Wi-Fi was being repaired, she later discovered he had actually turned the Wi-Fi in the house off in order to make her think it was not working so she would be forced to go to the library. Thus, this evidence was highly probative of the element of premeditation to the extent the State sought to introduce it to demonstrate appellant's manipulation of people and events. While this evidence was prejudicial, it was not unfairly prejudicial, when viewing the evidence in a light most favorable to the State, taking into consideration that the State was required to prove the element of premeditation, which was hotly disputed. Thus, we reject appellant's argument that the probative value of the evidence was outweighed by the risk of unfair prejudice.

{¶108} In reaching our decision, we also reject appellant's argument that the evidence served to appeal to the juror's emotions. Instead, we find the evidence assisted in illustrating the orchestration on appellant's part of the events that occurred that day. In that regard, the evidence served as an appeal to intellect rather than emotion or a sense of horror. Having found no error with respect to the

admission of the evidence, we need not engage in the harmless error analysis addressed by both parties.

{¶109} In light of the foregoing, appellant's fifth and final assignment of error is overruled. Further, having found no merit in any of the assignments of error raised by appellant, the judgment of the trial court is affirmed.

**JUDGMENT AFFIRMED.**